Robert Dale **HICKS** (92–5105), Plaintiff–Appellee/Cross–Appellant,

v.

Chief Richard A. **FREY** (92–5063); Carol Locke (92–5035), Defendants–Appellants,

**ARA Health Services, Inc., doing business as Correctional Medical Systems,** Defendant–Cross–Appellee.

Nos. 92–5035, 92–5063, 92–5105.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1993.

Decided May 13, 1993.

Rehearing and Rehearing En Banc Denied July 1, 1993.

---

Theodore H. Amshoff, Jr. (briefed and argued), Amshoff, Amshoff & Searcy, Louisville, KY, for plaintiff-appellant Robert Dale Hicks.

Jeanne R. Clemens (briefed and argued), Gregory J. Bubalo, Ogden, Newell & Welch, R. Allen McCartney (argued), McCartney & Swicegood, Louisville, KY, for defendant-appellee ARA Health Services, Inc.

Before: RYAN and SILER, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This is an appeal from a judgment on jury verdicts awarding damages pursuant to 42 U.S.C. § 1983 to a jail inmate who claimed Eighth and Fourteenth Amendment violations by jail officials and by a corporation that provided medical services at the jail, and its employees. The plaintiff, Hicks, charged that the defendants were deliberately indifferent to his serious medical needs while he was an inmate of the Jefferson County, Kentucky, Detention Center (the jail). The complaint, as amended, named nineteen defendants, but the jury returned verdicts against only three. The other defendants were dismissed either on directed verdicts or verdicts of the jury. The district court awarded judgment notwithstanding the verdict (JNOV) to one defendant. The two defendants found liable by the jury, and whose motions for JNOV were denied, appealed and the plaintiff cross-appealed the JNOV in favor of the third defendant. The plaintiff did not appeal the dismissal of the remaining defendants.

### I.

Because sufficiency of the evidence is the critical issue in both direct appeals, it is necessary to set out the facts and the disputed claims in some detail.

### A.

The defendant Frey was the officer in charge of the jail. The Jefferson County Fiscal Court had contracted with the defendant ARA Health Services, Inc., doing business as Correctional Medical Systems (CMS) to provide medical services to the inmates of the jail. The defendant Locke was the nurse employed by CMS who was in charge of medical services at the jail. The jury returned verdicts in favor of Hicks against Frey for $10,000, against CMS for $60,000, and against Locke for $1,000. The district court refused to disturb the verdicts against Frey and Locke, but set aside the verdict against CMS on its motion for JNOV. Before the trial began the district court dismissed four jail "sergeants," or guards. At the conclusion of all proof, the district court directed verdicts in favor of twelve nurses employed by CMS who worked under the supervision of Locke, and the jury rendered verdicts in favor of four other such nurses.

### B.

Hicks entered the jail in early 1987. On August 9, 1987, Hicks attempted to escape by rappelling down the side of the building. The rope broke and Hicks fell to the sidewalk. The fall resulted in serious injuries. Hicks suffered various fractures and a severe spinal injury that resulted in paraplegia. Hicks remained in a local hospital until September 22, 1987, when he returned to the jail. While at the hospital, he had various surgeries and was also placed in a Hoffman device to hold his pelvis together.

When he returned to the jail, Hicks was bedridden and paraplegic. His left leg was still in a cast and the Hoffman device was still in place. The jail had converted the dentist's office in the basement of the jail into a special room designed for Hicks. A Care Plan was also established for Hicks. It was a detailed list of specific actions to be taken that ranged from skin care needs to bowel training. It also provided for frequent turning to prevent development of new bedsores and physical therapy as prescribed by doctors at the hospital. Hicks voiced no complaints about his treatment in this converted cell. In late November of 1987, however, Hicks was moved to the Medical Walk on the sixth floor of the jail. Hicks testified that he was placed in an isolation cell and that the door was shut for twenty-three hours a day. The evidence at trial established that Hicks was placed in this isolation cell as punishment for his August escape attempt. This "lock down" was ordered despite the fact that Hicks could not walk and was bedridden. Hicks claimed his constitutional rights were violated while he was confined in this cell.

Witnesses for the defendants testified that CMS and jail employees followed the Care Plan and that Hicks' medical needs were not neglected. They pointed out that Hicks made a good recovery, considering the seriousness of his injuries, that his bedsores cleared up, and he was able to leave in a wheelchair when transferred to a State refor-

matory in February 1988. The evidence for Hicks presented a strikingly different story.

Hicks' evidence at trial included his testimony and that of fellow inmates Odie Swift, James Logsdon, and Tracey Wilson. Swift, Logsdon, and Wilson's testimony corroborated different parts of Hicks' testimony. Hicks testified that the defendants intentionally deprived him of drinking and bathing water, proper physical therapy, proper kidney stone treatment, and proper hygiene by allowing him to lie in his own vomit and feces for hours. The plaintiff and his witnesses also testified that: (1) the jail guards kicked on Hicks' door in the middle of the night and would intentionally withhold his food tray for up to thirty minutes; (2) he could not reach the emergency button in the isolation cell and actually had to bang on the wall to call for help; (3) for over two months the defendants failed to turn Hicks and that he had to get a fellow prisoner who had AIDS, Odie Swift to turn him, which resulted in great pain; (4) he was denied his wheelchair while in the isolation cell; (5) his linens became soiled and were not changed; and (6) he was denied prompt procurement of prescribed prosthetic devices. In addition to the eye witness testimony, a videotape that had been filmed by a local TV station was shown at the trial. This tape showed the towels tied on Hicks' bed that he claimed were used by inmate Swift to turn him.

Hicks' treating physician, Dr. Stephen Henry, also testified. Dr. Henry stated that on November 5, 1987, physical therapy in the form of a gentle range of motion for both lower extremities was recommended to be administered at least three times a week. On that date as well, AFO splints were recommended to be obtained for Hicks. These splints would stabilize Hicks' feet. Dr. Henry stated that "to some degree" these stabilizers were a serious medical need and that they should have been procured within two to three weeks.

Dr. Henry confirmed that on December 10th, physical therapy was still needed. On that date an oyster shell brace was prescribed as well. This brace would permit Hicks to sit in a wheelchair. Dr. Henry testified that it was important to get a para-plegic patient in a wheelchair for various medical reasons. He stated that the reasonable prescription time for the oyster shell brace was also two to three weeks. The splints and the oyster shell brace were provided to Hicks on January 21, 1988.

Dr. Henry could not state whether physical therapy had actually been administered at the jail. He did testify, however, that if physical therapy had been administered it would have reduced the likelihood of the development of the contractures on Hicks' foot. After Hicks was transferred to the reformatory on February 12, 1988, Dr. Henry continued to treat Hicks. The doctor decided in April to operate in order to correct the contractures in his left foot.

Hicks testified, and was supported by other witnesses, that he constantly complained of the deficiencies in his care and that Nurse Locke always promised to take care of the problems. He also testified that he complained to the prison guards about numerous deficiencies. In addition, Hicks testified, and the documentary evidence supports, that he filed seven grievances. At least two of these were seen by Locke. These grievances dealt with his placement in administrative segregation, the lack of water, failure to clean linens, the guards not having the proper keys to his cell, and the passing of medication by another inmate.

## II.

CMS, Frey, and Locke all moved to alter or amend the verdicts, for judgment notwithstanding the verdict, or in the alternative, a new trial. The district court granted CMS's motion for judgment notwithstanding the verdict and denied the motions of Locke and Frey. The trial court found that "[t]he record supports Hicks position that Frey and Nurse Locke were personally involved in the unconstitutional conduct. There were questions of fact which allowed the jury to conclude that both defendants were deliberately indifferent to Hicks' serious medical needs." We consider the direct appeals first.

## A.

Frey argues on appeal that he was entitled to a directed verdict, or to JNOV, because

there was no evidence that he personally violated any constitutional rights or knowingly acquiesced in such violations. He points to Hicks' testimony that Frey apparently never saw his grievances. No nurse or other employee ever reported to Frey that Hicks was being mistreated or neglected, and when Frey was in the area where Hicks was confined, Frey neither saw nor heard anything to indicate that Hicks' serious medical needs were being neglected. None of the inmates who testified for Hicks identified Frey as being involved in the alleged neglect of Hicks. Finally, Hicks' mother testified that she complained of conditions surrounding her son after a visit, but she did not report these conditions to Frey.

Frey argues that the fact he is the supervising official at the jail with the right to control jail employees, and employees of CMS, is not enough to support a judgment against him. Established case law requires that a person in his position either be directly involved in the unconstitutional acts or at least have implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending employees. He further contends that the fiscal court is the policymaking body for the jail, and that Hicks produced no proof that the fiscal court had delegated its policy-making role with respect to medical care of inmates to Frey.

### B.

Locke contends that she, too, was entitled to have the verdict set aside pursuant to her motion for JNOV. She points out that Hicks made no complaints about his treatment during the entire time he spent in the specially converted cell in the basement of the jail. The evidence shows that the bedsores had healed and the cast had been removed before Hicks was transferred to the sixth floor Medical Walk cell. She contends that the Care Plan was followed and emphasizes that Hicks was taken to the hospital four times for consultations and follow-up treatment while at the jail.

Locke argues that Hicks' claims of constitutional deprivation allege that his medical needs were neglected in three areas—hygiene, physical therapy, and delay in obtaining the oyster shell brace and AFO splints. She makes much of the fact that Hicks' condition improved throughout his stay at the jail. He was able to sit up in a wheelchair with the oyster shell brace and had AFO splints when he was transferred to the reformatory. She contends that she acted promptly to obtain these orthopedic devices after they were prescribed and that the delay in receiving them was not unreasonable.

Locke also argues that it is absurd to hold her liable for alleged neglect of Hicks by other nurses under her supervision when all of these nurses were exonerated either by directed verdicts or jury verdicts. Much of Hicks' testimony described alleged refusal by other nurses or guards to care for his sanitary and medical needs or to transmit his pleas for help to their supervisors. For all these reasons, Locke maintains she was entitled to JNOV.

Locke also contends that the district court erred in denying her alternative motion for a new trial. She argues that the district court admitted improper testimony of alleged neglect of Hicks by unidentified nurses and that she was prejudiced by her inability to counter such evidence. She also complains about the district court's jury instructions. She asserts that one instruction permitted the jury to find her liable as the CMS policy maker, when in fact she merely implemented corporate policy at the jail.

### III.

Both Frey and Locke argue that they were entitled to judgment as a matter of law because the evidence did not satisfy the requirements for holding persons in their positions liable for alleged constitutional violations.

### A.

In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court established that a State (or political subdivision) has a constitutional obligation, under the Eighth and Fourteenth Amendments, to provide adequate medical care to those whom it has incarcerated. The Eighth Amendment prohibition against " 'un-

necessary and wanton infliction of pain,'" is violated when there is "deliberate indifference to serious medical needs of prisoners." *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (citation omitted). This court stated in *Molton v. City of Cleveland,* 839 F.2d 240, 243 (6th Cir.1988), *cert. denied,* 489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989), that to sustain a claim of deliberate indifference "it is not necessary that the prison officials consciously sought to inflict pain by withholding treatment...." Mere negligence is not sufficient, however. The official's conduct "must demonstrate deliberateness tantamount to an intent to punish." *Id.* We held in *Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982), interpreting *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), that even though an official is not directly involved in alleged unconstitutional acts, the official may be held liable for failure to supervise and control his subordinates upon a showing that the official "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." (citation omitted). It is clear, however, that liability cannot be based solely on the right to control employees. *Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246 (6th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990).

With these holdings in mind we examine the claims of Frey and Locke that they should have been granted judgments as a matter of law.

### B.

■ There is no evidence that Frey personally observed the conditions that Hicks complained of and certainly none that he ordered subordinates to deny Hicks the care and treatment required by the Care Plan or his condition. Frey acknowledged that he had daily reports from the medical department concerning Hicks, but he could not recall that any complaints about Hicks' health care reached him. He stated that Hicks was a "topic of conversation on almost a daily basis for almost a year," and that he received a statement of Hicks' condition from the health administrator at a briefing every morning. He testified that this was a general statement that did not deal specifically with the prisoner's disability.

Frey acknowledged that he was aware of "a lot of complaints" made by Hicks, through "our normal process of communications." On redirect, Frey was asked and answered as follows:

3–104—Q. You told us that you were daily aware of Mr. Hicks and some of the complaints that he was making, is that right? A. As I testified yesterday, Mr. Hicks' condition, his complaints then, the problems we were having with his condition within the facility were daily topic of conversation.

There were inconsistencies in Frey's answers regarding his knowledge of Hicks' complaints. Further, some of his answers of the "I don't remember" type when asked about his knowledge of the substance of the complaints could have led a rational jury to doubt his credibility. After all, Hicks and his complaints were discussed at daily staff meetings. The jury could well have found from all the evidence that Frey had more knowledge of the condition of Hicks' confinement, and of his complaints, than he admitted.

All of Hicks' complaints related to the time he was confined in the isolation cell in Med Walk on the sixth floor. In passing through Med Walk Frey saw Hicks "on a number of occasions, but didn't speak to him." These observations were made by looking into the cell from a distance of five to ten feet. Frey acknowledged knowing that when Hicks was transferred to the Med Walk cell there was no longer a special bed like the one Hicks had in the basement. Instead, there was either a steel or concrete bunk with a mattress. It was this arrangement that Hicks claimed made it difficult for him to turn and exercise his limbs. Frey also knew that the isolation cell could not accommodate a wheelchair, and that Hicks did not have daily access to a shower, although a general directive of the jail requires such access.

### C.

Although Locke did not personally carry out the daily care of Hicks, she had supervisory authority over the nurses who were required to provide that care. Moreover, she had frequent contact with Hicks and knew of his complaints. There was an abundance of evidence from which the jury could have determined, and apparently did determine, that Hicks' serious medical needs were not attended to. Hicks and the other inmate witnesses all testified that Hicks was left lying in his own waste for hours at a time, was not turned on his bunk as frequently as the Care Plan required, and that he made numerous complaints, some of them to Locke directly. In addition, Hicks testified that he did not receive the prescribed physical therapy or attention to his kidney stones. Locke denied that these conditions existed or that Hicks' complaints were ignored, and maintained that she responded to all complaints, that Hicks did receive physical therapy, and that Hicks had "gravel" in his bladder, which did not require the treatment he demanded for kidney stones. The jury clearly believed Hicks and his witnesses.

The jury instruction to which Locke objected read as follows:

A corporation may act only through natural persons as its agents or employees and in general any agent or employee of a corporation may bind the corporation by his or her acts and declarations made by acting within the scope of his or her authority delegated to him or her by the corporation, or within the scope of his duties as an employee of the corporation.

You're instructed that C M S may be liable where you find that the plaintiff has been deprived of his constitutional rights and such deprivation was done pursuant to a final policy making authority with respect to a directive, guideline or decision promulgated by the corporation. When the plaintiff is injured as a result of corporate policy, regulation or decision, whether made by its board of directors or by those officials whose edicts or acts may fairly be said to represent official final policy making authority, the corporation itself may be responsible for the injury that it caused.

Mrs. Locke was an official whose acts constituted the final official policy of C M S in this incidence. Therefore, if you find the acts of Mrs. Locke deprived plaintiff of such constitutional rights C M S may be liable for such deprivation.

### IV.

The requirements and standards for a district court considering a motion for JNOV and an appellate court in reviewing the decision on such a motion are clear. Judge Bailey Brown stated them succinctly for the court in *Ratliff v. Wellington Exempted Village Schools Bd. of Ed.*, 820 F.2d 792, 795 (6th Cir.1987):

The issue raised by a motion for a judgment notwithstanding the verdict is whether there is sufficient evidence to raise a question of fact for the jury. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. An appellate court when reviewing the trial court's decision is bound by the same standard. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

Our review is *de novo. Hill v. Marshall*, 962 F.2d 1209, 1217 (6th Cir.1992).

### A.

Upon review of the record and after oral argument, we conclude that the district court properly submitted the claims against Frey and Locke to the jury, and properly denied their motions for JNOV. Viewing the evidence in the light most favorable to Hicks, and drawing all reasonable inferences in his favor we cannot say that the evidence "points so strongly in favor of the movant[s] that

reasonable minds could not come to a different conclusion."

The jury could have believed that Locke displayed deliberate indifference to Hicks' serious medical needs both by failing to address them herself and by implicitly authorizing, approving, or knowingly acquiescing in unconstitutional conduct of others over whom she had supervisory authority. This is not equivalent to finding Locke liable under a *respondeat superior* theory. In *Hays* we recognized that *respondeat superior* may not be the basis for liability of a supervisory officer in a § 1983 action, but we described the circumstances in which a supervisor can be held liable for the misconduct of subordinates. We believe the evidence in this case supports the jury's verdict against Locke.

Locke also appears to argue that the improvement in Hicks' medical condition while at the jail rules out any finding that he was subjected to deliberate indifference. We held in *Parrish v. Johnson*, 800 F.2d 600, 610–11 (6th Cir.1986), that no physical injury is required for a prisoner to recover on an Eighth Amendment claim of deliberate indifference to medical needs. Extreme conduct by custodians that causes severe emotional distress is sufficient. The plaintiff in *Parrish* was a paraplegic whose claims of deliberate indifference were similar to those of Hicks. And, in *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir.1991), we held the fact that a wound eventually healed did not mean that a plaintiff suffered no pain that could constitute cruel and unusual punishment from interruption in a prescribed plan of treatment. An actual injury is not required for a finding of an Eighth Amendment violation. *Id.* at 1155.

The case with respect to Frey is much closer because he had little direct, personal contact with Hicks. The jury could reasonably have inferred from the evidence, however, that the daily communications Frey acknowledged receiving about "Hicks' condition, his complaints then, the problems ... with his condition within the facility," required further inquiry and action by Frey. In the absence of inquiry or at least some show of concern about Hicks' condition and the problems with that condition, the jury

reasonably could have found that Frey at least acquiesced in the mistreatment of Hicks that the jury found occurred.

There is another basis on which the jury could have found Frey deliberately indifferent. Hicks was a paraplegic who was completely dependent upon a wheelchair for any mobility. Yet he was placed in a cell too small to accommodate his wheelchair, and thus for about three months was confined to a bunk with no opportunity to move about or exercise his injured limbs. Further, the Care Plan recognized that as a paraplegic Hicks had problems controlling urination and bowel movements. Yet, Frey acknowledged knowing that Hicks had no access to a shower while in the isolation cell. Regardless of whether Frey ordered Hicks' confinement in lock down, he admitted knowing Hicks was so confined and that his treatment was different from that of other prisoners on the Med Walk.

B.

■ We believe that the district court properly denied Locke's motion for a new trial. It was not reversible error to permit testimony about misconduct by nurses whom the witnesses could not identify by name. The instructions correctly advised the jury of the facts it had to find in order to render a verdict against Locke. That witnesses could not identify by name some of the subordinates whose acts she was charged with authorizing or condoning was irrelevant.

■ Locke's argument that the quoted jury instruction concerning CMS prejudiced her is totally without merit. In the first place, the instruction complained of told the jury the basis upon which it could find CMS liable. It did not authorize a verdict against Locke. The fact that the instruction erroneously described Locke as a policymaker did not prejudice her. The district court described Locke in this way as a limitation on CMS's potential liability, not as a basis for finding Locke liable.

We do not look at a portion of a court's jury charge in isolation. Rather, we consider the instructions as a whole. We have held that "even where a portion of the charge is

erroneous, if the point is explained and corrected in other parts of the charge so that the jury will not be misled, the jury's verdict should be affirmed." *Hurt v. Coyne Cylinder Co.*, 956 F.2d 1319, 1324 (6th Cir.1992); *Clarksville–Montgomery County School System v. United States Gypsum Co.*, 925 F.2d 993, 1003–04 (6th Cir.1991). When the instruction on the required findings in order to hold Locke liable to Hicks is read in context it is clear that the jury would not have been misled by the description of her corporate position in the separate instruction on the possible basis of CMS liability.

## V.

Hicks filed a cross-appeal from the order granting the defendant CMS judgment notwithstanding the verdict. He contends that, as the corporation providing medical services at the jail under contract with the fiscal court, CMS was properly found liable by the jury as a private entity performing state functions. Hicks argues that Locke acted on behalf of CMS and was the person in charge of the corporation's operations at the jail. Since a corporation can act only through natural persons, Hicks argues, when Locke deprived him of his constitutional right to be free from cruel and unusual punishment, CMS was responsible.

■ It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting "under color of state law." *West v. Atkins*, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). In granting JNOV, the district court recognized the fact that CMS was a proper defendant, but rested its decision upon the finding that there was no evidence of direct involvement by CMS in any decision to deny proper medical care to Hicks and that Locke was not clothed with authority "to make final decisions regarding medical services at the Jefferson County Jail."

■ We held in *Johnson v. Hardin County, Ky.*, 908 F.2d 1280, 1287 (6th Cir.1990), that Kentucky statutes make the fiscal court of each county the final authority over medical services at the county jail. In the absence of proof that this final authority has been delegated to another person or entity, an officer such as the jailer may not render the county liable for his acts under a *respondeat superior* theory.

■ Although the fiscal court contracted with CMS to provide medical services at the jail, there is no evidence that it delegated its final decision-making authority to CMS or its employees. In fact, the evidence is to the contrary. When Hicks' doctors prescribed the oyster shell brace and AFO splints, Locke could not order them on her own or CMS's authority; she requested the fiscal court to authorize the order and provide the funds. The same appears to have been the case with respect to physical therapy treatments. Locke's job was to see that CMS provided medical services in accordance with policies established by the fiscal court, following programs prescribed by her employer. Locke had authority to deviate from prescribed programs only upon application to and approval by her corporate superior at company headquarters in St. Louis. Neither she nor CMS was the final policymaker.

Hicks made no attempt to demonstrate that Locke was following a policy or custom of CMS in her acts and omissions toward Hicks that resulted in the jury finding her liable. She was sued both in her individual capacity and as CMS administrator at the jail. Hicks charged her with deprivation of his constitutional rights for her *departures* from the Care Plan and general health requirements, not for following a faulty plan prescribed by CMS. We conclude that the district court properly granted JNOV to CMS.

If we were the finders of fact it is quite possible that we might have viewed the evidence as advocated by the dissent. That is not the case, however. We remain convinced that there was sufficient evidence for the district court to submit the claims against Frey to the jury and that a proper application of the standards set forth in *Ratliff* supports both the district court's denial of the JNOV motion and our affirmance.

The judgment of the district court is affirmed on appeal and cross-appeal. Hicks

will recover his costs on appeal from Frey and Locke. The defendants Frey and Locke will bear their own costs. The defendant CMS will recover its costs on appeal from the plaintiff Hicks.

RYAN, Circuit Judge, concurring in part and dissenting in part.

Although I agree in large part with the majority opinion, I am constrained to register my respectful disagreement with that part of the opinion upholding the judgment against Richard Frey. I therefore write separately.

In concluding that there was sufficient evidence that Frey was deliberately indifferent to Hicks's serious medical needs, the majority opinion relies, appropriately to be sure, on *Hays v. Jefferson County,* 668 F.2d 869 (6th Cir.), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982), in which this court held that in order for liability to lie in this type of case, a plaintiff must show that a prison official "either encouraged the specific incident of misconduct or in some other way directly participated in it. *At a minimum* a plaintiff must show that the official ... implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct...." *Id.* at 874 (emphasis added). The majority opinion nonetheless postulates, despite acknowledging that "[t]he case with respect to Frey is much closer because he had little direct, personal contact with Hicks," op. at 1457, that a jury could have concluded Frey was required to act and inquire into Hicks's condition in order to avoid a constitutional violation. I, however, find no basis in existing law for imposing this type of affirmative obligation on a prison official. It resonates, in fact, of the type of negligence standard which courts are prohibited from imposing.

Hicks produced no evidence that Frey was aware of the violations Hicks asserts were occurring. The only evidence of knowledge that the majority opinion identifies is one statement by Frey that Hicks's condition and complaints "were daily topics of conversation." This statement certainly raises suspi-

cions about the nature and extent of Frey's knowledge about Hicks's condition.[1] However, it requires a considerable leap to conclude that the complaints to which Frey referred were complaints concerning acts or omissions amounting to unconstitutional conduct. Thus, even considering this statement, I do not think that Hicks met his burden. The law, in my view, requires, at the very least, that a plaintiff produce, for example, the testimony of even one guard that Frey was informed of Hicks's problems, or evidence that Hicks had complained to Frey, or any evidence at all tending to show that Frey had specific knowledge of constitutional violations.

This Hicks entirely failed to do. I therefore must respectfully dissent only from that portion of the majority opinion in which it affirms the judgment with regard to Frey.

---

1. I note that Hicks apparently did not consider it to be so, since he did not include this section of the transcript in the joint appendix and did not refer to it in the brief.