NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0482n.06
Filed: July 10, 2006

No. 05-5585

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RALPH TAYLOR, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| CITY OF FALMOUTH, GENE FLAUGHER, | ) | |
| DONALD ENGLAND, JANET FIELDS, MARY | ) | |
| ANN SHIELDS, CLAY CLIFFORD, DON | ) | |
| CROSS, and VIRGILENE MOORE, individually | ) | |
| and in their official capacities, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BATCHELDER and GRIFFIN, Circuit Judges, and ZATKOFF, District Judge.[*]

PER CURIAM.

Plaintiff Ralph Taylor ("Taylor") appeals an order of the district court granting summary

judgment in favor of defendants, the City of Falmouth, former mayor Gene Flaugher, and former

City Council members Donald England, Janet Field, Mary Ann Shields, Clay Clifford, Don Cross,

and Virgilene Moore, in their individual and official capacities. Taylor and his son, Shawn Taylor,

initially brought suit alleging violations of his First, Fourth, Fifth, and Fourteenth Amendments

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District
of Michigan, sitting by designation.

rights and several state law claims arising out of the towing of Shawn Taylor's vehicle and an

incident which occurred at a Falmouth City Council meeting when Donald England made a racial

insult to Taylor.

For the reasons set forth below, we affirm the judgment of the district court.

I.

Ralph Taylor is an African-American resident of Falmouth, Kentucky. He is also the father

of Shawn Taylor, an enlisted member of the United States Navy, a former party to this lawsuit and

the owner of the vehicle in question. In August 1998, the vehicle, an inoperable 1988 Chevrolet

Blazer, was parked on Taylor's property with expired Virginia license plates. At that time, the City

of Falmouth ("City") had an ordinance prohibiting the "storage of motor vehicles in an inoperative

condition . . . within the city limits except on premises authorized by the city for such purposes[.]"

No. 93.03A-1994. Pursuant to the ordinance, the City issued several citations to Taylor and

ultimately towed the Blazer to a local garage.

Taylor thereafter appeared in the Pendleton County District Court on the court date noted

on the citation. The citation was ultimately dismissed upon motion of the prosecutor on October 6,

1998. According to Taylor, he asked about return of the vehicle while at the court and was told to

contact the City about having the Blazer returned. Taylor further stated that he initially spoke with

former Mayor Jim Hammond, who provided no suggestions about how to reacquire the vehicle.

Additionally, Taylor spoke with Police Chief Greg Reis shortly after the citation hearing, and Reis

told him he would have to speak with the City Council about return of the vehicle. Contrary to

Taylor's recollection, Reis testified that he explained to Taylor that it was up to the court to determine what would be done with the vehicle.

In any event, Taylor periodically attended the Falmouth City Council meetings to inquire about the vehicle over the next several years. Specifically, Taylor attended the December 29, 1998, and the June 8, 1999, Council meetings. The minutes from both meetings reflect that Taylor inquired into the status of the Blazer and was referred to Chief Reis. Taylor made no further inquiries until January 2002, when he again attended a Council meeting to ask about the vehicle. Council membership had undergone changes since Taylor last presented the matter in June 1999, and the Council was consequently unprepared to address the matter. Accordingly, the Council referred the matter to Gene Flaugher to investigate and report back at the next Council meeting. Although Taylor did not attend the next Council meeting in February 2002, Flaugher informed the Council that the garage to which the vehicle had been towed was no longer in business and the vehicle could no longer be located.

Nothing further transpired until the August 6, 2002, Council meeting when Taylor attended and again asked about the vehicle. The minutes for the meeting reflect, in pertinent part, the following:

> Skip Taylor approached Council about the ongoing issue of a truck hauled away in 1998. City Clerk tried to tell Taylor that he would give him the insurance carrier and he could talk to them about the issue. Taylor said he wanted his truck. City Clerk said he didn't have anything to do with his truck being hauled away. At the time of this incident (1998) Falmouth had a City Administrator (Steve Hasson) who was making these calls. Taylor implied [Terry] England was responsible for removing his truck. After a verbal confrontation between Taylor and City Clerk, Council member [Donald] England asked both to be quiet and move on to something else.

Taylor told Council member England he wasn't afraid of him. England, upset at this statement returned a verbal obscenity and invited Taylor outside to discuss it further. The City police intervened to calm the issue.

Although termed a "verbal obscenity," the parties do not dispute that Donald England called Taylor a "big black bastard" and invited him to "step outside." According to Taylor's deposition testimony, Taylor was speaking in the open session when England said, "I'm tired of you coming down here asking about that damn Blazer." Taylor stated that England was looking at the floor while speaking, and then "called me a big black bastard and told me to come outside." After his remarks, Donald England exited the building. According to Taylor, he overheard "laughter at the council's table" at one point, and, in another, that he heard "nothing but just people just gasping." Regardless, Taylor "thanked [Council] for letting [him] address them," stated that he would be back the following month, told them that he was going home, and then exited the premises. Despite his efforts to leave, Taylor alleges that for thirty to forty-five minutes, Officer Ritchie and another officer prevented him from going home, detaining him on the steps of the building and explaining that there would be "no fighting on this sidewalk." Taylor also stated that at this point, another Council member and a police officer apparently also stepped outside to detain England, and no further confrontation occurred.

At the following month's Council meeting, Taylor was listed on the agenda and the vehicle was discussed. However, Taylor did not attend. He subsequently filed this lawsuit on July 1, 2003, on behalf of himself and his son, Shawn. The bulk of Shawn Taylor's claims survived summary judgment and were subsequently settled. The district court granted summary judgment to

defendants on Taylor's claims alleging violations of his rights under the First, Fourth, Fifth, and Fourteenth Amendments. This timely appeal followed.

II.

We review a district court's grant of summary judgment de novo. *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The district court does not "weigh the evidence and determine the truth of the matter but [instead], determine[s] whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. For such a motion, the district court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

III.

To adequately state "a claim under 42 U.S.C. § 1983, the plaintiff must properly allege two elements: (1) the defendant was acting under color of state law, and (2) the offending conduct deprived the plaintiff of rights secured under federal law." *Mezibov v. Allen*, 411 F.3d 712, 716-17

(6th Cir. 2005) (citation omitted), *cert. denied*, 126 S.Ct. 1911 (2006). Here, Taylor sued defendants as individuals and as Council members, and, in doing so, Taylor alleges a variety of constitutional claims. We will discuss each in turn.

## A.

A plaintiff alleging retaliation for exercise of First Amendment rights must establish that: (1) plaintiff engaged in protected conduct; (2) an adverse action was taken against plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – the adverse action was motivated at least in part by plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002).

Like the district court, we will assume that Taylor was engaged in protected conduct. We will further assume that the adverse action, the racial insult, was motivated at least in part by Taylor's protected conduct.

Nevertheless, we are not persuaded that the alleged adverse statement was significant enough to establish that Taylor suffered a violation of constitutional magnitude. The district court aptly rejected the notion that "every action, no matter how small, is constitutionally cognizable." *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (citations omitted); *Ingraham v. Wright*, 430 U.S. 651, 674 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."). From an objective standpoint, we hold that England's offensive remarks were a de minimis imposition on Taylor's exercise of his First Amendment rights.

Taylor, however, asserts that the racial insult, coupled with England's request to step outside (presumably to fight), was hardly insignificant. Indeed, he contends the thirty to forty-five minute detention after the Council meeting confirms that "any reasonable African-American citizen would be chilled knowing that he or she may be subject to the same racist slur and heavy-handed conduct by the police if they were to criticize City Council at one of their meetings." In accordance with Taylor's arguments, we must "'tailor[ ]' our analysis under the 'adverse action' prong to the circumstances of this specific retaliation claim." *Mezibov*, 411 F.3d at 721 (considering "whether the alleged defamation would deter a criminal defense attorney of ordinary firmness from continuing to file motions and vigorously defend his client.") (citation omitted); *see Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999) (formulating test under "adverse action" prong for elected City Council member as to whether a "public official of ordinary firmness" would be deterred from exercising her First Amendment rights). Accordingly, the Court must consider whether England's comments would deter a reasonable African-American citizen from continuing to speak out at City Council meetings.

In this case, the district court distinguished Taylor's allegations of adverse *statements* from adverse *actions* previously held to violate the First Amendment. This distinction is consistent with our precedent; indeed, we have found *conduct*, such as destroying duck blind structures in retaliation for speaking out against management practices, *Arnett*, 281 F.3d at 560, confiscating an inmate's food and legal papers in retaliation for filing civil-rights suits, *Bell*, 308 F.3d at 602, and deliberate harassment and moving an inmate to a mentally-ill inmate area and serving cold meals all in

retaliation for filing a lawsuit, *Thaddeus-X*, 175 F.3d 378, were all sufficient evidence of adverse action to survive summary judgment. We have not, however, specifically stated that *verbal abuse* is sufficient (or insufficient) evidence of adverse action.

Notably, the Fifth and Eighth Circuits have both held that "[m]ere allegations of verbal abuse do not present actionable claims under § 1983." *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993); *see Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000). Specifically, in *Doe*, the court held that a teacher's foul language, telling students that their handwriting "sucks," telling students that "if you had one eye and half a brain, you could do this," calling students "stupid," and referring to students as "bimbos," "fatso," and the "welfare bunch," was not sufficient adverse action because "[v]erbal abuse is normally not a constitutional violation." *Doe*, 214 F.3d at 955. The Eighth Circuit has also specifically distinguished verbal abuse from action. *Compare Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) (noting that "[i]n some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim . . . [b]ut, it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable . . . ." (internal quotation marks and citations omitted)) *with Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) ("[I]n contrast to *Naucke*, defendant's conduct went beyond mere speech, however offensive. Defendant, in his capacity as Mayor, engaged the punitive machinery of government [the issuance of parking tickets] in order to punish [plaintiff] for her speaking out.") Similarly, although we have held that "in some cases injury based on embarrassment, humiliation, and emotional distress" is sufficient to maintain a § 1983 action,

*Mattox*, 183 F.3d at 521 (internal quotation marks and citation omitted), we have also cautioned that "§ 1983 is a tort statute, [and] we must be careful to ensure that real injury is involved, lest we 'trivialize the First Amendment' by sanctioning a retaliation claim even if it is unlikely that the exercise of First Amendment rights was actually deterred." *Mezibov*, 411 F.3d at 721 (quotation marks and citation omitted). Such a caution applies to the instant case.

Accordingly, we hold that Taylor has failed to establish a prima facie violation of his First Amendment rights so as to state a retaliation claim under § 1983.

B.

Taylor next contends that the Council engaged in racially intimidating conduct, thereby depriving him of the equal protection of the laws. After engaging in a detailed discussion of our equal protection precedent, the district court concluded that "there is no binding circuit authority that a single racial slur is sufficient to support a claim for an equal protection violation." Taylor, however, urges this Court to consider both the alleged threat of bodily harm England directed at him and the confiscation of his son's vehicle in conjunction with England's racial slur. Taylor submits that an equal protection claim arises where, as here, a public official has made offensive remarks that are accompanied by harassment or some other conduct to deprive a victim of established rights.

The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. One member of this court recently stated, albeit in an unpublished opinion, that "[t]he use of racially discriminatory language can provide some evidence of a discriminatory purpose when that

language is coupled with some additional harassment or constitutional violation," although "[t]he use of a racial epithet by itself is not an actionable violation of the Equal Protection Clause." *King v. City of Eastpointe*, 86 F. App'x. 790, 814 (6th Cir. 2003) (Moore, J., concurring in part and dissenting in part) (citation omitted) ("The occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude."); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir.) ("[A]n officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation."), *clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999).

Here, although Taylor contends that the physical threat and detention satisfies the "harassment or other conduct" requirement, we are not persuaded. We conclude that the district court correctly held that the totality of the actions alleged by Taylor did not transform the outburst and following separation into a deprivation of constitutional rights.

IV.

Taylor further argues that liability must be imputed to the municipality of Falmouth because of the Council's inaction following England's outburst. The district court held, and we agree, that § 1983 liability cannot be imputed to the municipality of Falmouth. Although Taylor contends that, pursuant to *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), "a single decision may constitute an act of official government policy" and such a policy was established here, we disagree. *See Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996) ("To state a municipal liability claim under an 'inaction' theory, [plaintiff] must establish . . . the School Board's tacit approval of the

unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction . . . .").

The totality of the events Taylor has alleged cannot be said to represent "official policy." Although Taylor asserts that the other Council members "knowingly acquiesced" in the racial insult and subsequent detention, *see Hays v. Jefferson Cty., Ky.*, 668 F2d 869, 874 (6th Cir. 1982), the district court held, and we agree, that the record does not reflect that the Council tacitly approved of either.

V.

Because Taylor does not state a sufficient cause of action against the Council members in their official capacities, we need not address the balance of Taylor's complaints against the officials and Council members in their individual capacities. *Accord Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1990) (Officials are generally held personally responsible only for their own unconstitutional actions, rather than a "mere failure to act."); *Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) (holding that "[a]t a minimum, a § 1983 plaintiff must show that [an] official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers") (citation omitted).

Affirmed.