*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0097p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES M. JOHNSON II; CHRISTIE R. JOHNSON; JAMES M. JOHNSON III, a minor child by and through his parent, natural guardian, and next friend James M. Johnson II; JHOVAN T. JOHNSON, a minor child by and through his parent, natural guardian, and next friend James M. Johnson II,

>  No. 03-4200

　　　　　　　　　　　　*Plaintiffs-Appellants,*

　　　　*v.*

JIM KARNES, Franklin County Sheriff; FRANKLIN COUNTY/BOARD OF COUNTY COMMISSIONERS; VINCENT SPAGNA, M.D.; EMSA CORRECTIONAL CARE, INC.; JOHN DOES 1-10,

　　　　　　　　　　　　*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01165—George C. Smith, District Judge.

Submitted: November 2, 2004

Decided and Filed: February 25, 2005

Before: MOORE and GIBBONS, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** Kevin J. O'Brien, Thomas F. Martello, Jr., KEVIN O'BRIEN & ASSOCIATES, Columbus, Ohio, for Appellants. Jeffrey Lynn Glasgow, Tracie M. Boyd, FRANKLIN COUNTY PROSECUTOR'S OFFICE, Columbus, Ohio, Vincent J. Lodico, CRABBE, BROWN & JAMES, LLP, Columbus, Ohio, for Appellees.

　　　MOORE, J., delivered the opinion of the court, in which EDMUNDS, D. J., joined. GIBBONS, J. (pp. 9-10), delivered a separate dissenting opinion.

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————————

## OPINION

———————————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant James M. Johnson II ("Johnson") severed several tendons in his right hand immediately prior to his detention in the Franklin County Jail. After his release, Johnson brought this suit under 42 U.S.C. § 1983, alleging that Defendants-Appellees Jim Karnes, in his official capacity as Franklin County Sheriff ("Sheriff Karnes"); the Franklin County Board of Commissioners ("Franklin County Commissioners"); EMSA Correctional Care, Inc. ("EMSA"); and Vincent Anthony Spagna, M.D. ("Dr. Spagna") violated his constitutional right to adequate medical care in jail.[1]  The district court granted summary judgment in favor of all four defendants, and Johnson challenges that decision on appeal.  As Johnson did not put forward sufficient evidence to demonstrate a genuine issue of material fact as to whether his injuries resulted from a policy or custom of either Franklin County or EMSA, we **AFFIRM** the district court's decision to grant summary judgment in favor of Sheriff Karnes, the Franklin County Commissioners, and EMSA.  However, as we conclude that Johnson has established a fact issue on his claim against Dr. Spagna, we **REVERSE** the district court's decision to grant summary judgment in favor of Dr. Spagna, and **REMAND** this case to the district court for further proceedings.

## I. BACKGROUND

We take the facts of this case in the light most favorable to Johnson, the party opposing the summary judgment motion.  Sometime after dark on October 5th or 6th, 1998, Johnson severely cut his hand after tripping on a concrete stoop and falling at least partway through a glass door at the residence of his then-girlfriend, now-wife and co-plaintiff, Christie R. Johnson.  Johnson called 911, and both an ambulance and a police car were dispatched to the scene.  As Johnson was bleeding severely, medical personnel brought him out to the ambulance and bandaged his wound.  While the medical personnel were caring for him, the police discovered that there was an outstanding warrant for Johnson's arrest.[2]  Johnson was then transferred from the ambulance to the police car, and taken to the emergency room of St. Ann's Hospital.

At the time of his deposition, Johnson did not have a good memory of what took place during that emergency room visit.  However, he did remember a female doctor telling him that his tendons had been completely severed, that he was to return for surgery in three to seven days[3] (because the tendons needed some time to harden before surgery was performed), and that if he did not return in the appropriate time period, he would "probably . . . lose the use of [his] hand permanently."  Joint Appendix ("J.A.") at 151 (Johnson Dep.).  Additionally, he remembers the doctor stating at least some of these things in the immediate presence of the police officers responsible for him.

Johnson was transferred from St. Ann's Hospital to the Franklin County Jail, apparently later that same night or early the next morning.  His initial medical screening form, dated October 6, 1998, bears the

———————————————

[1]Johnson is the husband of Plaintiff-Appellant Christie R. Johnson and the natural father of Plaintiffs-Appellants James M. Johnson III and Jhovan T. Johnson.  The complaint was never amended to allege specific claims against the John Doe defendants, and it does not appear that any of the John Doe defendants were ever served with process.

[2]Although it is not entirely clear from the record, the police were apparently acting on a warrant for Johnson's arrest on domestic violence charges.

[3]The actual form provided to Plaintiff says:  "Follow up 7-10 DAYS with Dr. H. Aziz at . . . Call [xxx-xxxx] for an appointment."  Joint Appendix ("J.A.") at 92 (Emergency Department AFTER-CARE INSTRUCTIONS).  Dr. Spagna indicated in his deposition that he read this instruction as indicating that the scheduling of the appointment, rather than the appointment itself or the actual surgery, needed to take place in 7-10 days.

notation "See Hosp. Report" in response to a question about obvious medical problems.  J.A. at 79 (Initial Medical Screening).  After the initial medical evaluation, it may have been "a couple of days," J.A. at 159 (Johnson Dep.), before Johnson even had the opportunity to speak to a nurse.  After this, a jail nurse came periodically to give Johnson antibiotics that had been prescribed by one of the emergency room doctors but did not give him any painkillers.  During the entire period Johnson was at the jail (a period of 31 days, including the day he entered and the day of his release), the bandages on his arm were changed only once.  The jail nurses did not check the wound on any regular basis.  Although he is not completely certain, Johnson stated that he believed he had the opportunity to speak with a doctor only once during his entire period of confinement.

During his confinement, Johnson submitted at least two "kites" (medical request forms) and one social service call card.  The first medical request form, dated October 13, 1998, describes Johnson's medical problem as:

> "EAR INFECTION, EXTREME PAIN IN LEFT EAR.  ALONG WITH EXTREME PAIN IN RIGHT HAND.  SEVERED TENDONS NEED SURGERY TO [illegible, but possibly "RECONNET" (sic)] TENDONS.

J.A. at 95.  A notation at the bottom, in a different handwriting and apparently dated November 4, 1998, reads "To be seen 11/11/98 by Dr. Aziz."  J.A. at 95.  This notation appears in a section marked "FOR STAFF USE ONLY" and appears to be signed by "T. Hairston RN."  J.A. at 95.  The second medical request form, dated October 28, 1998, describes Johnson's problem as:

> THE SAME PROBLEM THAT I'VE HAD SENSE (sic) I'VE BEEN HERE (10/5/98), SEVERED TENDONS IN MY RIGHT HAND THAT I'VE BEEN NEEDING SURGERY ON, THAT NO ONE HERE SEEMS TO CARE ABOUT!  HELLO, I'M IN EXTREME PAIN.

J.A. at 96.  There is no staff notation on the medical request form dated October 28, 1998.  The social services call card, dated October 23, 1998, begins:

> SOCIAL SERVICES REQUEST AGAIN FOR MEDICAL ATTENTION, INMATE HAS NEEDED SURGERY FOR QUITE SOME TIME NOW (10/5/98)[.]  INMATE HAS PUT IN CALL CARDS AND MEDICAL SLIPS ON NUMEROUS OCCASIONS SEEKING AN URGENCY IN THIS MATTER.  THE INMATE IS LOOKING AT PERM[A]N[E]NT LOSS OF USE OF RIGHT HAND . . . DUE TO SEVERED TENDONS IN HIS RIGHT HAND WHICH HE NATURALLY IS (RIGHT HANDED).

J.A. at 97-98.  After discussing several issues more directly related to a social services request, it ends with the statement "INMATE IS CLOSE TO HAVING A NERVOUS BREAKDOWN.  PLEASE HELP BEFORE IT'S TO[O] LATE."  J.A. at 98.  In addition to Johnson's own efforts, one or more members of Johnson's family were also trying to contact jail personnel about Johnson's medical situation.

At the time of Johnson's confinement, medical services at the jail were contracted out to EMSA.  Dr. Spagna, an EMSA employee, served as "medical director of the Franklin County jail and workhouse."  J.A. at 253 (Spagna Dep.).  Dr. Spagna testified in his deposition that Johnson's medical request forms would have been reviewed first by the nurses, and only transferred to Dr. Spagna if the nurses determined that there was a problem worthy of his attention.[4]

---

[4]Specifically, Dr. Spagna stated:
A kite is a form that is utilized by the personnel at the jail and workhouse and these are forms that are filled out by the inmate where they state whatever problems they perceive they may have.
They are then funneled through the nursing personnel who are then required to read these and make an evaluation

In his deposition, Dr. Spagna asserted that it was his understanding that Johnson's tendon "was not severed as much as it was injured," and that "[n]o one ever mentioned severed meaning complete break." J.A. at 273 (Spagna Dep.).  He further noted that he had not seen the October 13, 1998, medical request form, the October 28, 1998, medical request form, or the social services call card.  Dr. Spagna did not "have any independent recollection of actually doing a full scale exam on [Johnson]," J.A. at 274-75 (Spagna Dep.), but on the basis of documents in Johnson's records Dr. Spagna admitted that he "must have seen him" on October 16, 2004.  J.A. at 282-84 (Spagna Dep.).  When asked about an order, apparently dated October 23, 1998, ordering that Johnson's sutures not be removed until after Johnson had seen a certain plastic surgeon,[5] Dr. Spagna explained that he "didn't want to guess" whether the sutures might actually have been holding Johnson's tendons together.  J.A. at 286 (Spagna Dep.).  Dr. Spagna also stated the he had an informal "curbside consult[]," J.A. at 292, with an orthopedist, Dr. Won Song, about Johnson's injuries, but Dr. Song did not recall this conversation.[6]

Johnson was discharged from the facility on November 5, 1998.  He immediately sought surgery, but the initial operation was unsuccessful.  A second surgery was successful in reconnecting the tendons, but this did not restore Johnson to anything near full use of his right hand.  Johnson, who was thirty-two years old on the date of his deposition, can no longer make a fist.  He has full use of his thumb, but his use of each of the four fingers on his right hand is severely impaired.  He can no longer write normally with his right hand, which was his dominant hand prior to these events.  He could type prior to his injury, but he can now only "peck" with the injured hand.  Although once very athletic, he can no longer lift weights or participate in sports.

## II.  ANALYSIS

### A.  Jurisdiction and Standard of Review

As Johnson sued under 42 U.S.C. § 1983, the district court had jurisdiction pursuant to the general federal question statute, 28 U.S.C. § 1331.  We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.  We conduct de novo review of decisions granting summary judgment, drawing all reasonable inferences in favor of the nonmoving party.  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  To prevail, the nonmovant must simply show "sufficient evidence to create a genuine issue of material fact." *McLean*, 224 F.3d at 800.  Accordingly, to survive summary judgment in a § 1983 action, Johnson must demonstrate a genuine issue of material fact as to the following "two elements:  1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) (internal quotations omitted).

---

as far as the urgency, you know, of these individuals being seen and evaluated and the nurses themselves are responsible for actually interviewing the individual and getting a perception of what is actually going on.
J.A. at 259 (Spagna Dep.).

[5] The instructions provided by St. Ann's indicated that Johnson should "[r]eturn to your doctor or to the ER for suture removal *in 7 days*."  J.A. at 92 (Emergency Department AFTER-CARE INSTRUCTIONS) (emphasis added).

[6] Dr. Won Song stated in his deposition that he had neither any records relating to Johnson nor any recollection of a conversation with Dr. Spagna about Johnson.  However, Dr. Song did indicate that he could have responded to the type of question Dr. Spagna claims to have asked him.

**B.  Dr. Spagna**

    **1.  Element One:  Deprivation of a Federal Right**

        **a.  The Right to Adequate Medical Care in Prison**

Johnson alleges the violation of one federal right:  the constitutional right to adequate medical care during pretrial confinement.  The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishment Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 101-02, 104-05 (1976); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989); *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners.").  A prisoner's right to adequate medical care "is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs."  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *cert. denied*, 537 U.S. 817 (2002).  Although the right to adequate medical care does not encompass the right to be diagnosed correctly, this court has "long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner."  *Id*. (citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027 (1990)).[7]

        **b.  Components of an Adequate Medical Care Claim**

A claim for the deprivation of adequate medical care "has two components, one objective and one subjective."  *Id*.  "To satisfy the *objective component*, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"  *Id*. at 702-03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (emphasis added).  "To satisfy the *subjective component*, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Id*. at 703 (emphasis added).

        **(i)  Objective Component:  Sufficiently Serious Medical Need**

"Where the seriousness of a prisoner's need[] for medical care is obvious even to a lay person," this obviousness is itself sufficient to satisfy the objective component of the adequate medical care test.  *Blackmore v. Kalamazoo County*, --- F.3d ---, 2004 WL 2792016 (6th Cir. 2004), at *7.  However, if the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 2004 WL 2792016, at *6, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment."  *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).  We conclude that Johnson's need qualifies as serious under either requirement.

First, Johnson's medical need is quite obvious.  His medical request forms stated that his tendons were completely severed — a condition that almost any lay person would realize to be serious.  The bandages on his arm and his explanation of how the injury occurred were not inconsistent with this statement.  Accordingly, his medical need qualifies as obvious under *Blackmore*.

Second, Johnson attached an affidavit from Elizabeth B. Lottes, D.O., to his memorandum opposing the summary judgment motion.  In her affidavit, Dr. Lottes, who treated Johnson during his emergency room

---

[7]There is a substantial difference between those cases involving "deliberate indifference to a patient who *requested* medical care" and those cases involving a failure to properly detect a prisoner's invisible medical condition.  *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989).  After all, "[i]t is one thing to ignore someone who has a serious injury and is asking for medical help; it is another to be required to screen prisoners correctly to find out if they need help."  *Id*.

visit, stated that she had "diagnosed Mr. Johnson's injury as a laceration of the interior aspect of his right wrist, including laceration to the first, second, and third extensor tendons." J.A. at 333. She further stated "[t]hat it is common medical knowledge, which should be known to every medical practitioner, that severed tendons must be repaired in a timely manner, because over time the severed tendons will retract, and may become irreparable." J.A. at 334. Even if Johnson's injury failed to qualify as obvious, this affidavit would constitute verifying medical evidence sufficient to satisfy the *Napier* test for summary judgment purposes.[8] In other words, the Lottes Affidavit, together with Johnson's deposition testimony that he had lost most use of his right hand, would be sufficient to demonstrate a genuine issue of material fact as to the detrimental effect of the delayed treatment.

### (ii)  Subjective Component:  Knowledge and Disregard

To satisfy the subjective component of the adequate medical care test, an inmate must demonstrate that the official in question "subjectively perceived a risk of harm and then disregarded it." *Comstock*, 273 F.3d at 703. This is the deliberate indifference standard. *See Farmer*, 511 U.S. at 837. We have explained that "[t]he requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703. Accordingly, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id*. However, it is not necessary for a plaintiff to "show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835).[9] Put simply, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id*. (quoting *Farmer*, 511 U.S. at 836).

Although the burden to prove subjective knowledge is "onerous," it "is subject to proof by 'the usual ways.'" *Id*. (quoting *Farmer*, 511 U.S. at 842). It is "permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id*. The subjective knowledge standard does not allow "a prison official [to] 'escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Id*. (quoting *Farmer*, 511 U.S. at 843 n.8).

In this case, Johnson has demonstrated a genuine issue of material fact as to both aspects of the subjective component of the adequate medical care test. First, in regard to actual knowledge, the medical request forms Johnson filled out stating that his tendons were severed, together with Dr. Spagna's testimony about the circumstances under which information on the medical status of inmates would be conveyed to him, were sufficient to establish a genuine issue of material fact as to Dr. Spagna's knowledge of Johnson's fully severed tendons.

Several factual observations lend support to such a finding. Dr. Spagna admits that he saw Johnson at least once, on October 16 — just three days after Johnson submitted a form noting that he had severed tendons. Dr. Spagna then issued a written order in the case on the same day that Johnson submitted a social services call card — an event which at least suggests that Dr. Spagna might have been made aware of the contents of the social services call card. Finally, Johnson filed yet another medical request form on October

---

[8]There is a potential conflict between Dr. Lottes's diagnosis of Johnson's injury as tendon "laceration" and her statements about the detrimental effect of delayed repair of "severed" tendons. However, as Johnson submitted other evidence indicating that his tendons were in fact severed, this conflict is not appropriately resolved on a summary judgment motion.

[9]This court has specifically noted that "[o]fficials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain." *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 513 U.S. 873 (1994).

28 — twelve days after Dr. Spagna initially saw him, and five days after the social services call card. Based on Dr. Spagna's testimony about the way medical forms were processed,[10] a reasonable jury could conclude that Dr. Spagna was not being truthful or accurate when he stated that he had not seen the medical request forms and did not know that Johnson's tendons were in fact severed. Accordingly, the district court erred when it concluded that "no evidence suggests that Dr. Spagna knew that Mr. Johnson's tendons were completely severed." J.A. at 24 (Dist. Ct. Op.).[11]

Second, as to disregard of that risk, the combination of the Lottes Affidavit's statement about the risks inherent in delayed tendon surgery; Dr. Spagna's failure to schedule Johnson for prompt surgery; Dr. Song's inability to remember speaking with Dr. Spagna in regard to Johnson's injury; Johnson's testimony about his problems in receiving treatment; and Johnson's medical request forms very explicitly stating his need for prompt surgery is sufficient to demonstrate a genuine issue of material fact as to whether Dr. Spagna disregarded that risk.

### 2. Element Two: Action Under Color of State Law

The Supreme Court has explicitly held that § 1983 liability applies to physicians who are not formally employed by a state, but who instead serve prison populations as government contractors. *West v. Atkins*, 487 U.S. 42, 54-57 (1988). In other words, private physicians serving inmate populations satisfy the state-action requirement of the statute. Dr. Spagna appears to qualify as such a physician, and neither his motion for summary judgment nor his appellate brief make any assertion to the contrary. Accordingly, we hold that Dr. Spagna's actions relating to Johnson's care qualify as state action for purposes of § 1983.

### 3. Conclusion as to Dr. Spagna

Johnson has established a genuine issue of material fact as to whether Dr. Spagna deprived him of a constitutional right, and Dr. Spagna acted under color of state law. Accordingly, we must reverse the district court's grant of summary judgment in favor of Dr. Spagna.[12]

## C. Sheriff Karnes, the Franklin County Commissioners, and EMSA

### 1. Amenability of Each Entity to Suit

A suit against Sheriff Karnes in his official capacity[13] is permissible under § 1983, and is equivalent to a suit against the entity on whose behalf he acts — Franklin County. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Similarly, a suit seeking financial compensation from the Franklin County Board of Commissioners is equivalent to a suit against Franklin County itself. Accordingly, we will discuss Johnson's suits against Sheriff Karnes and the Franklin County Commissioners (together, the "County Defendants") at the same time. As EMSA correctly concedes, Br. Appellees EMSA and Spagna at 15, a

---

[10]As noted above, Dr. Spagna testified it was institution policy that when nurses reviewed a medical request form reflecting a sufficiently urgent situation, Dr. Spagna would be contacted. Because of the obvious urgency of Johnson's request forms, a jury could reasonably infer that Dr. Spagna was in fact contacted regarding Johnson's situation.

[11]Although the district court states that "no evidence" suggested that Dr. Spagna knew of the severed tendons, the single page in the court's order discussing this issue suggests instead that the district court impermissibly weighed the evidence. *See* J.A. at 24 (Dist. Ct. Op.).

[12]Dr. Spagna did not assert qualified immunity in the court below, and in fact specifically called the district court's attention to the fact that he had not asserted this defense. *See* J.A. at 337 (Reply Mem. Supp. Mot. Summ. J. of EMSA and Dr. Spagna). We express no opinion as to whether he can now assert qualified immunity on remand.

[13]Plaintiffs-Appellants do not challenge the district court's finding that, in his *individual capacity*, Sheriff Karnes was entitled to qualified immunity. *See* Br. Appellants at 10-11.

private entity that contracts to perform traditional state functions may also be sued pursuant to § 1983.  *See Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993); *see also Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).

### 2.  Policy or Custom

It is clear that "a municipality cannot be held liable [under § 1983] *solely* because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691.  However, "when execution of a [municipal] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . the [municipal] government as an entity is responsible under § 1983."  *Id*. at 694.  Accordingly, to survive a summary judgment motion brought by the County Defendants, Johnson must demonstrate a genuine issue of material fact as to whether his injury is the result of a policy or custom of Franklin County.  The appropriate inquiry for a government contractor defendant is similar.  Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory.  *See Street*, 102 F.3d at 802.  The difference, however, is that a private contractor is liable for a policy or custom *of that private contractor*, rather than a policy or custom of the municipality.  *See Hicks*, 992 F.2d at 1458; *Street*, 102 F.3d at 817.

Johnson has not introduced sufficient evidence to demonstrate a genuine issue of material fact as to whether his injury was the result of an actual policy or custom, either of the County Defendants or EMSA.  Accordingly, we must affirm the district court's decision granting summary judgment in favor of these defendants.

### III.  CONCLUSION

The district court's decision to grant summary judgment in favor of Sheriff Karnes, the Franklin County Commissioners, and EMSA is **AFFIRMED**; its decision to grant summary judgment in favor of Dr. Spagna is **REVERSED**, and the case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.

———————————

**DISSENT**

———————————

JULIA SMITH GIBBONS, Circuit Judge, dissenting in part. I agree with that part of the majority's decision affirming the district court's decision to grant summary judgment in favor of Sheriff Karnes, the Franklin County Commissioners, and EMSA. I also agree that Johnson has satisfied the objective component of the test governing his claim for the deprivation of adequate medical care, because he has alleged a medical need that is "sufficiently serious" for purposes of this claim. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). However, I disagree with that part of the majority's opinion (specifically, Part II.B.1.b.(ii)) that holds that Johnson has demonstrated a genuine issue of material fact as to the subjective component of the adequate medical care test. Contrary to the majority's conclusions, Johnson did not show sufficient evidence such that a jury could have reasonably found in his favor on his Eighth Amendment claim.

The majority states that "the medical request forms Johnson filled out stating that his tendons were severed, together with Dr. Spagna's testimony about the circumstances under which information on the medical status of inmates would be conveyed to him, were sufficient to establish a genuine issue of material fact as to Dr. Spagna's knowledge of Johnson's fully severed tendons." This is incorrect. The mere fact that Spagna described "the circumstances under which information on the medical status of inmates would be conveyed to him" does not at all bear on the issue of whether Spagna actually knew of any risk to Johnson's health. After all, Spagna testified that he would not see these forms unless nursing personnel passed them along to him. There is no evidence indicating that nursing personnel had in fact passed Johnson's forms along to Spagna. Spagna testified that he had not seen them. Without any basis in the record, the majority explicitly suggests that Spagna was lying. Even if Johnson's forms conveyed "obvious urgency," this urgency would not by itself mean that a jury could reasonably infer that Spagna knew of Johnson's injury, contrary to the majority's intimations. In fact, the evidence indicates that Spagna was responsive to Johnson's medical needs, as Spagna saw them. He arranged to make an appointment for Johnson with a plastic surgeon per the after-care instructions given by the hospital that had originally seen Johnson. He also testified that he consulted with an orthopedist when Johnson's appointment was delayed to ensure that the time frame for Johnson's treatment was acceptable.

The majority cites no relevant evidence to support its suggestion that there was a genuine issue of material fact as to whether Spagna knew of and disregarded the risk in delaying Johnson's medical care. For example, the majority points out that Dr. Song was unable to remember whether he spoke with Spagna about Johnson, but it does not explain how this is a basis for finding that Spagna knew of and disregarded a risk of serious harm to Johnson. Likewise, the fact that Lottes described the risks inherent in delayed tendon surgery in her affidavit says nothing about whether Spagna knew of and recklessly disregarded a substantial risk of serious harm to Johnson.

The majority recognizes that a "plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id*. at 703. Even though Johnson makes no such showing, the majority nonetheless finds that Johnson met his burden. "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id*. Spagna may or may not have performed negligently or incompetently, but no reasonable juror could find that he violated Johnson's constitutional rights, at least not on the evidence produced in connection with the summary judgment motion. In sum, the district court was correct in its conclusion that "no evidence" existed to suggest that Dr. Spagna knew that Johnson's tendons were completely severed.

For these reasons, the facts of this case do not support the majority's determination that Johnson presented evidence sufficient to demonstrate that Spagna "subjectively perceived a risk of harm and then

disregarded it." *Id*. While I agree with the majority that the district court did not err in granting summary judgment to Sheriff Karnes, the Franklin County Commissioners, and EMSA, I would also affirm the district court's judgment with respect to Spagna.