**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0389n.06
Filed: July 1, 2008

**No. 07-2232**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| GEORGE S. GOULSON, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| YUM! BRANDS, INC., and | ) | O P I N I O N |
| YORKSHIRE GLOBAL RESTAURANTS, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:    DAUGHTREY, CLAY and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** This case presents the question whether a release of liability for all claims, known or unknown, executed by plaintiff in conjunction with separation from employment with his former employer, is effective to bar claims against the former employer where plaintiff alleges the release is vitiated by (1) the parties' mutual mistake, and (2) the employer's failure to give full consideration in exchange for the release. The district court granted the former employer's motion for summary judgment, holding the release is valid and enforceable to bar plaintiff's claims. On appeal, plaintiff contends the district court erred in its application of the law. For the reasons that follow, we affirm.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff George S. Goulson was hired by A&W Restaurant Holdings, Inc. ("A&W") as Senior Vice President of Franchise Investment in 1995. In 1999, he became Executive Vice President of Franchise Investment, a position he held until his separation on September 30, 2000. During this period, he was awarded some 1,198 shares of restricted stock by Yorkshire Global Restaurants, Inc. ("Yorkshire"), A&W's parent corporation and defendant-appellee herein. Restricted Stock Award ("RSA") Agreements § 3(a), JA 143, 150.

His interests in these shares were to fully vest in 2003 and 2004 unless forfeited earlier by termination of his employment. *Id*. at § 7, JA 145, 152. Termination of employment prior to 2003 would result in forfeiture of all interests in the shares unless vesting was accelerated, which would occur if termination of employment occurred because of Goulson's death, disability or retirement. *Id*. at § 3(b). In 2000, when Goulson decided to resign, a severance package was put together that provided for accelerated vesting of his interests in the restricted stock, as of the date of separation, September 30, 2000. Severance Package, June 27, 2000, JA 156. By thus dispensing with the "death, disability or retirement" prerequisite to accelerated vesting, the severance package overrode the express terms of the RSA Agreements.[1] The letter detailing the terms of the severance package, signed both by Goulson and Sidney J. Feltenstein, Jr., Yorkshire Chairman and Chief Executive Officer, did not expressly advise Goulson whether he had to take any action to either accept or decline the offered accelerated vesting. However, record evidence indicates that Goulson realized

---

[1]Among the other provisions of the severance package, Yorkshire agreed to repurchase 4,803 shares of preferred stock owned by Goulson at a total price of $459,647.10. JA 299.

that acceptance of the restricted stock would entail personal income tax consequences—consequences that factored into his decision whether to accept or not. Goulson aff. ¶ 13, JA 115.

He therefore inquired orally and in writing whether Yorkshire would agree to repurchase restricted shares of a value equal to any income tax liability he would incur on vesting of the shares. *Id*. at 15, JA 115; Goulson letter Sept. 26, 2000, JA 160. Goulson believed Yorkshire was obliged to do so under § 5 of the RSA Agreements. *See* JA 144, 151. He requested an extension of time "relative to the acceptance of the stock," thereby implying that his decision whether to accept the vesting of the stock depended on Yorkshire's willingness to help with his tax liability. Goulson letter, JA 160. In apparent response to the request, Goulson received, within two or three days, by facsimile copy, a communication to the Yorkshire Board of Directors obtaining their consent to amendment of § 5 of the RSA Agreements, deleting Yorkshire's obligation to cover the restricted stock recipient's tax liability, effective September 25, 2000. Memorandum Sept. 27, 2000, JA 162. Goulson read the memorandum and understood that Yorkshire had "changed the rules" such that he would be liable for any tax liability incurred as a result of vesting. Goulson dep. pp. 124-25, JA 666. Yet, though his request for extension was not granted, and though the memorandum signaled a denial of his request for Yorkshire to bear his tax liability, Goulson admittedly dropped the matter. He "essentially filed [the memorandum] and didn't think another thing about it." *Id*. at pp. 118-19, JA 665. He made no further inquiry about the requested extension or the restricted stock. *Id*. at pp. 121, 125, JA 665-66.

Although there had been oral communications on the subject, it is undisputed that Goulson did not communicate in writing whether he intended to accept or decline the accelerated vesting of

his interests in the restricted stock before September 30, 2000, or at any time thereafter until July 2004. Yet, in 2001, Yorkshire treated the restricted stock as having been forfeited. In the words of Forrest W. Ragsdale, III, Yorkshire Senior Vice President and General Counsel, Goulson had "declined to accept" the restricted shares when he left the company's employment. Ragsdale letter, July 3, 2001, JA 310.

On April 23, 2002, Goulson received an Option Exercise Notice from Yorkshire, advising him of his rights vis-a-vis any restricted stock granted him and options to purchase Yorkshire stock held by him. JA 182. By attachment to the notice, Yorkshire provided Goulson with a "complete list of all Options and Restricted Stock that you currently own." *Id*. The notice purported to contain detailed instructions and "urged" the recipient to "read it carefully" and contact George J. Nemphos if any information was believed to be incorrect. *Id*. The notice advised Goulson of his 2,391 shares subject to options, but indicated that he held zero shares of restricted stock. JA 187. When he received the notice, Goulson perused it and probably discussed it with his wife. Goulson dep. pp. 141-45, JA 671-72. Goulson does not remember noticing that the attached list indicated he held zero shares of restricted stock; he trusted Yorkshire to complete the paperwork properly and treat him fairly. *Id*. at 146-47, JA 672; Goulson aff. ¶ 22, JA 117. Goulson admitted that, at the time he received the notice, he had forgotten about the restricted stock. Goulson dep. p. 51, JA 648. Hence, he made no inquiry regarding any perceived inaccuracy in the attachment to the notice. Goulson dep. p. 147, JA 672.

The next day, April 24, 2002, Goulson executed the accompanying form, exercising his option to have Yorkshire purchase the listed option shares. JA 184.[2]  By doing so, per ¶ 5 of the form, Goulson expressly "forever and irrevocably" released Yorkshire from liability for "any and all claims," "known or unknown," relating to "the Options or the Restricted Stock."  JA 185.

It was not until the Summer of 2003 that Goulson rediscovered the 1998 and 1999 RSA Agreements. *Id*. p. 67, 157, JA 652, 674.  Believing that he owned the restricted shares awarded to him and that his interests had fully vested on separation, he contacted George Nemphos and Forrest Ragsdale and asked about the restricted shares.  *Id*. p. 68, JA 652.  Goulson was advised that his interests had failed to vest before he left Yorkshire. *Id*.

Goulson believed that the failure to account for the outstanding shares of restricted stock in his exercise of his option rights in April 2002 was the product of oversight or "mutual mistake."  He contacted David Novak, Chairman of Yorkshire's successor, Yum! Brands, Inc., by letter dated July 27, 2004. JA 189.  In the hope of avoiding litigation, Goulson requested Yum! Brands to repurchase his restricted shares under the terms offered in the April 23, 2002  letter.  Goulson estimates that the repurchase price for these shares under the offered terms would have totaled $304,172.20.  Goulson aff. ¶ 23, JA 117.  Counsel for Yum! Brands responded by letter dated October 14, 2004, explaining that the restricted shares had not vested when Goulson separated from employment with Yorkshire because, as several former officers of Yorkshire quite clearly recalled, he rejected the restricted shares so as not to incur the tax liability associated with vesting. JA 193-94.

---

[2]This transaction resulted in after-tax net income to Goulson of $238,389.50.  Jarmosevich letter, May 8, 2002, JA 332-33.

Goulson then commenced this action in the Oakland County Circuit Court, from which it was removed to the Eastern District of Michigan, based on diversity of citizenship, on April 20, 2005. Goulson's second amended complaint was filed on July 5, 2005. JA 9. Both Yum! Brands, a North Carolina corporation, and Yorkshire, a Maryland corporation, were named as defendants. The complaint asserts four claims: breach of contract, intentional misrepresentation, negligent misrepresentation, and innocent misrepresentation. On November 10, 2005, the action against defendant Yum! Brands was dismissed for lack of personal jurisdiction. After completion of discovery, both plaintiff Goulson and defendant Yorkshire filed motions for summary judgment. The district court granted Yorkshire's motion for summary judgment, while denying Goulson's. In essence, the district court agreed with Yorkshire's contention that the release executed by Goulson is unambiguous and effectively bars all of his claims. Alternatively, the district court ruled that Goulson's claims are also barred under the "tender back" doctrine, because he did not, when he commenced suit, tender back to Yorkshire the consideration he received when he executed the release. On appeal, Goulson contends the district court misapplied the law. He contends the release is not enforceable because it was not supported by full consideration and was vitiated by the parties' mutual mistake.

## II. ANALYSIS

### A. Standard of Review

The court of appeals reviews *de novo* an order granting summary judgment. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id*. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*.

### B. Enforceability of Release

Goulson contends the district court erred in holding that the release contained in the Option Exercise Notice form bars this action. He contends the validity of the release is contingent on promised consideration which he never received, i.e., the vesting of 1,198 shares of restricted stock that he had been awarded. Goulson concedes that his ownership of these shares was not disclosed in the attachment to the notice. Yet, he insists this "mistake" by Yorkshire, and his mistake in failing to detect Yorkshire's error, did not alter the facts that he *had* been awarded the shares, he never relinquished them in writing, and Yorkshire remained obligated to repurchase them under the terms of the notice.

Under Michigan law, as the district court correctly observed, the release executed by Goulson is presumed to be valid. *Stefanac v. Cranbrook Educ. Cmty.*, 435 Mich. 155, 164-65 (1990). Goulson is presumed to have executed the release knowingly and to have received the recited

consideration. *Id.* To repudiate the release, and bring suit in avoidance of it, it is incumbent on Goulson to show, by a preponderance of the evidence, "that the release is unfair or incorrect on its face." *Id.* at 165. "A release is invalid if (1) the releasor is dazed, in shock, or under the influence of drugs, (2) the nature of the instrument was misrepresented, or (3) there was other fraudulent or overreaching conduct." *Skotak v. Vic Tanny Int'l, Inc.*, 203 Mich. App. 616, 618 (1994).

The district court correctly concluded that the language of the release is unambiguous and undisputably broad enough to bar claims seeking to enforce obligations relating to the restricted stock. Order p. 9, JA 72. The district court summarily rejected Goulson's claim of mistake, noting that Goulson acknowledged having read the form before signing it, and holding that he would be bound by its terms even if he had not read them, citing *Rowady v. K Mart Corp.*, 170 Mich. App. 54, 60 (1988) ("[A] person cannot avoid a written contract on the ground that he did not attend to its terms, did not read it, supposed it was different in its terms, or that he believed it to be a matter of mere form."). *Id.* at 9-10, JA 72-73.

### 1. *Mutual Mistake*

In attempting to repudiate the release, Goulson does not rely on a theory that he was under the influence of any drug or medication when he read and signed the form. Nor does he contend that his consent was influenced by fraud or overreaching conduct by Yorkshire. Nor has he argued that the *nature* of the document was misrepresented to him. Goulson has not even argued, in the language of *Stefanac*, "that the release is unfair or incorrect on its face." Rather, in asserting his mutual mistake theory, he has relied on two contract cases in which rescission was granted based on the parties' mutual mistake.

Before even discussing the two cases, we recognize that the law of "compromise and release

is not to be confused with the law of contract, in which equivalents are exchanged, for the very

essence of a release is to avoid litigation, even at the expense of strict right." *Stefanac*, 435 Mich.

at 164 (quoting *Kirl v. Zinner*, 274 Mich. 331, 334-35 (1936)). In other words, the two cases cited

by Goulson, neither of which involves a release, have only marginal relevance to the question posed

in this case. Yet, to the extent they are instructive at all, they afford little support for Goulson's

position.

**(a)** *Lenawee County Bd. of Health v. Messerly*

The first case is *Lenawee County Bd. of Health v. Messerly*, 417 Mich. 17, 24 (1982). It

recognizes that "a contract may be *rescinded* because of a *mutual* misapprehension of the parties,

but this remedy is granted only in the sound *discretion* of the court." *Id*. at 26 (emphasis added).

Although Goulson relies on *Messerly* for its discussion of mutual mistake, he fails to recognize that

the opinion, as a whole, works strongly against him. In fact, *Messerly* poses three distinct problems

for him.

First, whereas *Messerly* recognizes the appropriateness of rescission as a potential remedy

in the case of a mutual mistake, Goulson is not seeking rescission. He is quick to disavow any desire

to rescind the agreement in which the release appears. That is, although Goulson's right to bring this

action depends on his successful repudiation of the release itself, he does not want to rescind the

whole agreement in order to repudiate the release. Goulson recognizes that rescission would require

him to surrender to Yorkshire the consideration he received in exchange for the release, i.e., the

estimated $238,389.50 in after-tax income generated by Yorkshire's repurchase of his 2,391 option

shares. *Stefanac*, 435 Mich. at 176 (holding "that a plaintiff must, in all cases where a legal claim is raised in contravention of an agreement, tender the consideration recited in the agreement prior to or simultaneously with the filing of suit.").[3] Goulson would prefer to repudiate the release only to the extent necessary to enforce Yorkshire's supposed obligation to repurchase the restricted shares not included in the attachment listing. Such an argument was specifically rejected in *Stefanac*, where the court held that until the party who would repudiate the release puts the other party *in statu quo*, a precondition to setting aside the release, the release remains a good defense, barring actions in contract and in tort. 435 Mich. at 166. Hence, Goulson's insistence that he doesn't mean to rescind the parties' agreement, but rather to enforce it, is a futile exercise in semantics. He cannot even begin to enforce any part of the agreement until he first carries his burden of proving that the release should be set aside.

The second problem posed by *Messerly* relates to the mutual mistake requirement. In *Messerly*, the court concluded that, irrespective of whether the asserted mutual mistake goes to the essence of the consideration or goes merely to its quality or value, rescission will be an appropriate remedy only "when the mistaken belief relates to a basic assumption of the parties upon which the contract is made, and which materially affects the agreed performances of the parties." 417 Mich. at 28-29. We do not have this sort of mutual mistake in this case.

Goulson identifies Yorkshire's mistake as consisting of its failure to list the 1,198 restricted shares awarded to him in 1998 and 1999 in the listing attached to the notice. Yet, the record does

---

[3]Goulson's failure to tender this consideration back to Yorkshire by the time he commenced this action was held by the district court to be a second ground for dismissal of his claims.

not support the notion that Yorkshire views this failure as a mistake at all. Yorkshire's position is that Goulson forfeited the restricted shares on separation, September 30, 2000, when he failed to expressly accept the offer of accelerated vesting. Ragsdale letter, July 3, 2001, JA 310; Allen dep. pp. 60-61, 66-68, JA 557, 559. Hence, Yorkshire sees no incorrectness or mistake in the listing indication that Goulson held zero restricted shares on April 23, 2002. According to Yorkshire, the listing accurately reflects what Yorkshire's records then showed. The asserted "mistake" was not, therefore, a mutual misapprehension, but a unilateral one. Moreover, even accepting Goulson's characterization, *his* asserted mistake is different than the mistake he attributes to Yorkshire.

Goulson identifies his mistake as consisting of his failure to examine the attachment listing carefully, which resulted in his failure to discover the erroneous listing of zero restricted shares. This characterization is at odds with Goulson's own deposition testimony, where he conceded that, by the time he received the April 23, 2002 notice, he had forgotten he owned the restricted stock. Goulson dep. p. 51, JA 648. Hence, if Goulson had forgotten all about the restricted shares, it is unlikely that correction of *his* mistake through a more careful review of the attachment listing would have revealed the supposed incorrectness. Yet, even accepting Goulson's characterization as credible, it is still not the sort of mistake for which relief would be available under *Messerly*. His failure to read the notice carefully did not give rise to a misapprehension regarding a basic assumption of the parties affecting their promised performances. Moreover, as the district court recognized, Goulson's failure to read the notice carefully is not a mistake that Michigan law is prepared to excuse in any event. *See Rowady*, 170 Mich. App. at 60.

*Messerly* presents yet a third problem for Goulson. *Messerly* recognizes that "rescission is an equitable remedy which is granted only in the sound discretion of the court." 417 Mich. at 31. "Rescission is not available, however, to relieve a party who has assumed the risk of loss in connection with the mistake." *Id*. at 30. Here, Goulson was urged by the Option Exercise Notice to read the notice and attachment carefully and to contact Yorkshire if the information in the attachment was incorrect. JA 182. By executing the release, he forever and irrevocably released and discharged Yorkshire from any all claims and causes of action whatsoever, known or unknown, suspected or unsuspected, relating to the restricted stock. JA 185. In broad, explicit, unambiguous language, the parties thus clearly allocated the risk of loss associated with any mistake to Goulson. Under these circumstances, per *Messerly*, even if there were a "mutual mistake," equity would not come to Goulson's aid and permit him to repudiate the release.

### (b) *Garb-Ko v. Lansing-Lewis Services*

The second case cited by Goulson in connection with his mutual mistake theory is *Garb-Ko, Inc. v. Lansing-Lewis Servs., Inc.*, 167 Mich. App. 779 (1988). While Goulson cites the case for its discussion of mutual mistake, *Garb-Ko*, too, does not help him. In *Garb-Ko*, the court followed the teaching of *Messerly*. Finding a mutual mistake relating to a basic assumption of the parties, the court allowed the seller to rescind the contract for sale of land. The court noted that the parties' agreement had allocated the risk of loss to the purchaser. Because the seller, not the purchaser, was the party adversely affected by the parties' mistake, the purchaser's assumption of the risk of loss was held not to preclude rescission by the seller and the contract was deemed voidable by the seller. Here, in contrast, Goulson is both the party adversely affected by the asserted mistake and the party

who assumed the risk of loss by releasing Yorkshire from liability for any potential claim. Under these circumstances, per *Garb-Ko*, Goulson cannot repudiate the agreement even if he were adversely affected by a significant mutual mistake, because he expressly and indisputably bore the risk of the mistake. 167 Mich. App. at 785 ("when a legally significant mutual mistake has occurred, the contract is voidable by the adversely affected party *unless* he bears the risk of the mistake") (emphasis added).

Goulson attempts to distinguish *Garb-Ko* by again insisting that he does not want to rescind the parties' agreement, but enforce it. In other words, Goulson's mutual mistake theory is founded on his steadfast refusal to acknowledge that the release exists as an integral part of the very agreement he purports to enforce. Unless and until he carries his burden of demonstrating the invalidity of the release (rather than its imagined nonexistence), he is barred from enforcing any other part of the Option Exercise Notice agreement. Goulson's mutual mistake theory, finding practically no substantive support in the very cases he relies on, fails to carry this burden for him.

### 2. *Lack of Full Consideration*

Goulson also argues that the release is not enforceable because Yorkshire did not pay him the full promised consideration. He contends that he is not bound by the release because Yorkshire first breached the Option Exercise Notice agreement by failing to repurchase his shares of restricted stock. That is, in the words of *Stefanac*, "the release is unfair." 435 Mich. at 165.

According to the April 23, 2002 Option Exercise Notice, "all restricted stock granted by the Company" was to become "fully vested" immediately before the "effective time" of the then-imminent merger between Yorkshire and TRICON Global Restaurants, Inc. JA 182. In ¶ 3 of the

accompanying form which Goulson executed on April 24, 2002, Goulson expressly understood that "all my shares of Restricted Stock" would become fully vested immediately before the effective time, that he would receive payment for them, less withholding taxes, in conjunction with the closing of the merger, and that his shares would then cease to be outstanding. JA 185. As Goulson argues, the release contained in ¶ 5 of the same form is expressly conditioned on the vesting of his restricted stock and receipt of payment therefor. *Id*. Since he had never submitted any written notice of his intent to relinquish or forfeit the 1,198 shares awarded to him in 1998 and 1999, as required by § 9 of the RSA Agreements, *see* JA 145, 152, Goulson contends he had necessarily retained ownership of the shares. And since he did not receive the promised repurchase payment for his 1,198 shares as they vested in conjunction with the Yorkshire-TRICON merger, Goulson contends Yorkshire breached the condition precedent to enforcement of the release.

There are several obvious flaws in this argument. First, the terms of the RSA Agreements, at § 7, *see id*., make it clear that Goulson's interests in the 1,198 restricted shares would have been *automatically* forfeited at the time of his separation from Yorkshire, September 30, 2000, but for the severance package, which offered him accelerated vesting of the restricted shares. In other words, notwithstanding the § 9 general written notice requirement, Goulson did not have to give written notice to relinquish his interests in the restricted shares; if he separated from Yorkshire for any reason other than death, disability or retirement, he would forfeit them automatically. In the severance package, in what amounted to a permissible written amendment of the RSA Agreements however, Yorkshire offered to rescue him from this automatic forfeiture. The severance package offered accelerated vesting. JA 157.

The terms of the severance package are silent on whether and how Goulson needed to expressly accept or decline the offered vesting. Nonetheless, considering the record as a whole, there is no genuine issue of material fact as to whether some further communication from Goulson was mutually understood to have been required in response to the offer. According to Michael Allen, Yorkshire's former Senior Vice President of Human Resources, when interests in restricted shares vested, Yorkshire needed to know whether the recipient was going to exercise the option of accepting vesting because of the income tax liability incurred at the time of vesting. Allen dep. pp. 46-48, JA 554. Consistent with this understanding, Allen expected that Goulson would advise him whether he intended to exercise his option to accept vesting of his restricted shares prior to September 30, 2000. *Id*. p. 60, JA 557. Allen believed that Goulson "most certainly" understood this. *Id*. p. 66, JA 559.[4] Indeed, Goulson's September 26, 2000 letter to Allen, requesting an extension of time "relative to the acceptance of the stock" pending Yorkshire's decision on whether to shoulder his income tax liability, evidences his understanding that he needed to accept the vesting to make the conveyance complete. JA 160. Yet, despite this manifest understanding, even as his request for extension was not granted and he received notice that Yorkshire would not be assuming responsibility for his potential tax liability, Goulson did nothing "relative to the acceptance of the

---

[4]In fact, Allen further testified that George specifically told him "he was not going to elect his restricted stock award." *Id*. p. 66-68, JA 559. This testimony is controverted, as Goulson denies making any such statement. Goulson dep. pp. 121, 125, 132, JA 665, 666, 668. The district court appropriately refrained, therefore, from relying on this statement in its analysis, as do we.

stock." He "essentially filed it [i.e., the notice that Yorkshire would not assume responsibility for the tax liability] and didn't think another thing about it." Goulson dep. p. 119, JA 665.

Against this backdrop, Goulson's present argument that, despite his silence in September 2000—a silence that continued unabated until the summer of 2003—he believes he retained some undefined interest in the restricted shares in April 2002, rings hollow. So forgotten were the restricted shares that even when Goulson received the Option Exercise Notice on April 23, 2002, advising him that Yorkshire's records indicated he held zero shares of restricted stock, he did not question it.

Further, in relation to whether Goulson received full consideration for the release, there is no dispute that Goulson received the full promised compensation for all options and restricted shares of record, as set forth in the notice, which incorporated the attachment listing. *This* is the promised consideration in exchange for which he executed the release. Pursuant to the attachment listing, the ¶ 3 term "all my shares of Restricted Stock," for which Goulson could expect to receive payment, was defined as consisting of zero shares. Though he was expressly urged to read the notice and attachment carefully, he did not question Yorkshire's statement that he held zero shares of restricted stock. Instead, he executed the release the next day, expressly giving up his right to enforce any claim, "known or unknown," and undisputedly got what he bargained for—just not what he much later hoped he was entitled to. Hence, Goulson's lack-of-full-consideration argument falls far short of demonstrating by a preponderance of the evidence that "the release is unfair." Nor is the evidence sufficient to create a genuine issue of material fact.

### III. CONCLUSION

The release asserted by defendant Yorkshire, unambiguous and presumptively valid under Michigan law, and not shown by plaintiff Goulson to be invalid, was properly enforced to bar plaintiff's action. Accordingly, the district court's judgment is **AFFIRMED.**[5]

---

[5]Our affirmance of the district court's judgment on this ground makes it unnecessary to address the alternative ground, i.e, enforcement of Michigan's "tender back" rule.