NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0044n.06

Case No. 16-1561

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 19, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JEFFREY HINNEBURG, as Personal Representative of the Estate of Ashlee P. Hinneburg, Deceased, | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| NICOLE MIRON; LUKAS EDRINGER; DAVID EALY; JACOB THORNE; TIFFANY DELUCA, R.N.; CINDY DEVIEW, R.N., | ) ) ) | O P I N I O N |
| Defendants-Appellees. | ) ) | |

BEFORE:     COLE, Chief Judge; BOGGS and SILER, Circuit Judges.

COLE, Chief Judge.  Ashlee Hinneburg died on April 14, 2014, while incarcerated at the Macomb County Jail ("Macomb") in Mt. Clemens, Michigan.  Jeffrey Hinneburg, the personal representative for her estate, filed suit alleging that the defendants were deliberately indifferent to Hinneburg's serious medical need.  We affirm the district court's grant of summary judgment to Officers Nicole Miron and Lukas Edringer, and Nurse Tiffany DeLuca, because there is no genuine dispute of material fact that the defendants were not deliberately indifferent to Hinneburg's serious medical need.

## I. BACKGROUND

On April 14, 2014, Hinneburg filled a prescription at an urgent-care facility for pills that contained hydrocodone. On that same day, she pleaded guilty and was sentenced to ninety days in jail for a probation violation.

Following the sentencing, and while at the Roseville Police Department, Hinneburg apparently removed something from her genital area that the parties believe was a pill and placed it in her mouth. Around 1:30 p.m., Hinneburg was transported from the Roseville Police Department to Macomb. Hinneburg was transported with Janelle Craft, another inmate, who testified that Hinneburg appeared "extremely high" because she was nodding out and "falling all over the place."

At Macomb, Hinneburg was assigned to holding cell 10. She did not receive any medical attention before being placed in the holding cell. While there, Janet Tate, another inmate, observed that Hinneburg appeared "visibly high" because "she was nodding out and talking to herself."

At 3:36 p.m., a deputy escorted Hinneburg and Craft to a bench in front of the nurse's office to await their intake medical screenings. Video footage shows Hinneburg dropping her head repeatedly and slumping forward while waiting for the screening. Dylan Corbett, an inmate, observed Hinneburg while she was waiting to see the nurse and testified that she appeared "very high" and was "nodding out." (Corbett Dep. R. 77-4, PageID 848.) While Hinneburg was waiting for her screening, Officer Jacob Thorne also saw her drop her head about five times in five minutes. Thorne believed that Hinneburg's behavior was abnormal but did not check on her because she was with other officers and was about to see the nurse. Also, Thorne

did not see Hinneburg stumble, trip, or struggle while walking into the nurse's office or back to her cell.

Hinneburg waited to see Tiffany DeLuca, the nurse, for about five minutes. DeLuca completed Hinneburg's medical questionnaire around 3:58 p.m., ending her medical screen. DeLuca reported that Hinneburg did not show any signs of medical distress. During the screening, DeLuca asked Hinneburg a number of questions about her medical history, many of which were contained in a five-page medical questionnaire. Hinneburg acknowledged that she was currently taking two prescription medications, Effexor and Buspar, but denied taking any other medications or drugs. DeLuca did not observe any of the normal signs of opiate intoxication when she interviewed Hinneburg. She says that Hinneburg was "alert[,] [s]he was coherent[, and] answer[ed] the questions appropriately." (DeLuca Dep., R. 67-4, PageID 624.) After the screening, Hinneburg walked back to holding cell 10 unassisted. At some point while Hinneburg was in holding cell 10, either before or after the medical screening, Craft saw her take more pills.

Miron and Edringer worked in the booking room on the day Hinneburg died. Miron heard commotion coming from cell 10 while she was in the booking room. Miron and Edringer went to cell 10 at 4:29 p.m. and saw that inmates Binney and Tate "were upset because Hinneburg was flooding the cell and spilling juice and putting apples into the toilet." (Miron Dep., R. 66-20, Page ID 522.) Tate testified that "[Hinneburg] needed some medical attention." (Tate Dep., R. 77-3, PageID 839.) Miron did not believe that these actions were odd for an inmate and believed it was just an inmate misbehaving.

Miron and Edringer removed Hinneburg from the cell, had her change into a jail uniform, and then placed her in a detoxification cell. They claim that this was to separate her from Binney

and Tate, not because they perceived that she had used drugs or alcohol. Miron, while accompanying Hinneburg to change her clothing, asked Hinneburg about her strange behavior. Miron testified that Hinneburg blamed her actions on not having slept in a few days and being upset about her jail sentence. Miron also stated that Hinneburg changed on her own and put all of her belongings in the property bag by herself. Miron did not believe that Hinneburg had a medical problem.

Edringer stated that he photographed Hinneburg and created her wristband before she was moved to the detox cell. Edringer stated that she "was responsive to my instructions" and "was not dropping her head or body." (Edringer Aff., R. 66-21, PageID 537.) He stated that "he did not see her stumble or stagger, or walk with spaghetti legs." (*Id.* at 538.)

Officer David Ealy was assigned to "booking detex," which meant that he conducted hourly rounds throughout the jail, beginning around 3:00 p.m. Ealy observed Hinneburg about once every hour and checked for "chest rise," while she was in the detoxification cell. (Ealy Dep., R. 66-22, PageID 542.) He further testified that seeing Hinneburg lying down with her chest rising would indicate that she was sleeping. Around 6:08 p.m., Cynthia Deview, another nurse, made an unsuccessful attempt to obtain a urine sample from Hinneburg.

At 8:19 p.m., Ealy was unable to verify that Hinneburg had chest rise. "[U]pon noticing that . . . she was unresponsive, [Ealy] contacted the medical staff immediately. Upon the medical staff coming into the cell, the medical staff . . . began administering smelling salts. When the smelling salts were unsuccessful, I rolled Hinneburg from her stomach to her back and began chest compressions." (Ealy Dep., R. 77-11, PageID 1001.)

Paramedics transported Hinneburg to McClaren Macomb Hospital in Mt. Clemens at about 8:42 p.m., where she was pronounced dead at 9:08 p.m. The Macomb County Chief

Medical Examiner conducted an autopsy and concluded that hydrocodone intoxication caused Hinneburg's death.

The plaintiff filed the instant complaint under 42 U.S.C. § 1983, claiming that the six defendants violated Hinneburg's rights under the Eighth Amendment. The four correctional officers, Miron, Thorne, Edringer, and Ealy, moved for summary judgment. The nurses, DeLuca and Deview, also moved for summary judgment. The defendants argued that there was no genuine dispute of material fact and that they were not deliberately indifferent to Hinneburg's serious medical need. They argued, in the alternative, that they were entitled to qualified immunity.

The district court granted summary judgment to all of the defendants. The district court assumed that Hinneburg had an objectively serious medical need and focused on whether the defendants knew she was seriously ill and failed to provide her the appropriate medical care. The court held that no reasonable jury could find that any of the defendants knew or should have known that Hinneburg had a serious medical need and failed to provide her with the necessary medical care, and that, in the alternative, all of the defendants were entitled to qualified immunity.

The plaintiff appeals the district court's grant of summary judgment, but no longer pursues any claims against Officer Thorne, Officer Ealy, or Nurse Deview.

## II. ANALYSIS

### A. Standard of Review

This court reviews a summary judgment determination de novo. *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014). Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a). Courts consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B. Deliberate Indifference

The Supreme Court has long held that the government is obligated to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference to serious medical needs of prisoners" constitutes an Eighth Amendment violation, actionable under 42 U.S.C. § 1983. *Id.* at 104–05.

Deliberate indifference claims have two components—one objective and one subjective. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires evidence of a "sufficiently serious" medical need. *Id.*; *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). The subjective component requires proof "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

As a result, the subjective prong of *Farmer* has three parts. First, "the official must . . . be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837. Second, the official must draw the inference. *Id*. Third, the official must consciously choose to ignore that risk. *Id*.

At the summary judgment stage, the plaintiff must "make a showing sufficient to establish the existence" of deliberate indifference, *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986), because the plaintiff bears "the onerous burden of proving the official's subjective knowledge" at trial. S*ee Comstock*, 273 F.3d at 703.

### i. Objective Prong

The district court assumed that the plaintiff had met the objective prong in this case. In general, the principal fact the plaintiff must prove under the objective prong is that the medical need was sufficiently serious. Reviewing the evidence in the light most favorable to the plaintiff, Hinneburg has met the objective prong. Several of the inmates, through sworn affidavits and depositions, testified as to the extreme nature of Hinneburg's intoxication, and Tate specifically testified that she believed Hinneburg needed medical attention. In cases like this one, where death results from a failure to provide medical services, and there is evidence that lay persons, Tate in this case, recognized the necessity for a doctor's attention, the objective prong is usually met. *See Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 540 (6th Cir. 2008).

### ii. Subjective Prong

The court must analyze the subjective prong for each defendant. *Id.* at 542. In cases of drug-overdose deaths while in custody, this court has found that the fact that officers know or should have known that a detainee ingested drugs is not enough to establish deliberate indifference. *See Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) (finding officers acted constitutionally where they did not provide treatment to a detainee who they had not seen ingest drugs, who was not incapacitated, and who did not ask for help). On the other hand, correctional officers should be held liable where they refused to "verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Border v. Trumbull Cty. Bd. of Comm'rs*, 414 F. App'x 831, 838 (6th Cir. 2011) (alterations in original) (citation omitted).

In *Smith v. Erie County Sheriff's Department*, this court found that officers who merely believed that a woman was intoxicated, but not in need of medical attention, did not act with deliberate indifference to a serious medical need. 603 F. App'x 414 (6th Cir. 2015). The decedent in that matter was arrested for disorderly conduct after an officer observed that she was not wearing shoes and smelled alcohol on her breath. *Id.* at 416. A corrections officer found two bottles of pills prescribed to her in her purse and did not notify anyone else of the prescription medication until after her death. *Id.* at 416–17. The decedent was found dead shortly after her initial arrest. *Id.* The decedent's daughter filed a § 1983 suit against the officers, claiming that they were deliberately indifferent to her mother's serious medical need. The court found that "[n]o reasonable juror could conclude that [the decedent] appeared to be so intoxicated that she needed immediate medical attention." *Id.* at 421.

The case at hand has even less evidence of deliberate indifference than *Smith* because the defendants did not know that Hinneburg had obtained pills earlier that day or ingested one or more over the course of the afternoon. The district court found that Hinneburg's behavior, combined with the fact that the defendants were unaware she had taken hydrocodone, showed only that she appeared intoxicated. The evidence does not demonstrate that the defendants knew about Hinneburg's serious medical need and failed to provide her with the medical attention she required.

### a. Officers Miron and Edringer

Miron and Edringer responded to the commotion in cell 10, and Miron interacted with Hinneburg as she changed her clothing prior to Hinneburg's reassignment to detox cell 2. Miron described Hinneburg as agitated while she changed, but otherwise normal and responsive. Edringer observed Hinneburg while he photographed her and created her wristband. He found

her responsive to his directions and stated that she did not have difficulty walking or controlling her body.

Plaintiff argues that he meets the subjective prong because Miron and Edringer should have known from Hinneburg's strange and volatile behavior in the holding cell and while she was changing that she was intoxicated at a life-threatening level. The plaintiff claims that Tate's statements about Hinneburg's actions in the holding cell create a genuine dispute of material fact and contradict Miron and Edringer's observations. Miron and Edringer, however, were not present for the whole time that Tate observed Hinneburg in cell 10. They were only present for the time that it took them to remove her from the cell. Because this inquiry is necessarily individualized, the court cannot attribute observations to the defendants that they did not in fact observe.

Miron's and Edringer's observations and interactions with Hinneburg did not indicate that Hinneburg had a serious medical need, so there is no genuine dispute of material fact that Miron and Edringer were not deliberately indifferent. As in *Smith*, the most Miron and Edringer knew was that Hinneburg was intoxicated, but no evidence suggested that they knew or could infer that Hinneburg had a serious medical need. Therefore, the plaintiff has not met the subjective prong of the deliberate-indifference analysis as to Miron or Edringer.

b. Nurse DeLuca

DeLuca conducted the medical screening of Hinneburg and, with Hinneburg's participation, completed her medical questionnaire. The record establishes that Hinneburg left cell 10 at 3:36 p.m., waited for DeLuca for about five minutes, and completed the screening when DeLuca e-signed Hinneburg's questionnaire around 3:58 p.m. Accordingly, DeLuca spent no more than seventeen minutes with Hinneburg. DeLuca did not observe Hinneburg nodding

her head repeatedly outside her office nor was she aware of Hinneburg's behavior in the holding cell. Hinneburg was alert and coherent, and able to complete the medical screening form, which included five pages of questions about her medical history. DeLuca stated that Hinneburg did not appear intoxicated and displayed no signs of opiate use. Again, at most, DeLuca was aware that Hinneburg was intoxicated, but the evidence does not show that she was aware of facts from which she could draw the inference that Hinneburg had a substantial risk of serious harm. Thus, the subjective prong of the deliberate-indifference analysis is not met as to DeLuca.

Consequently, the plaintiff has failed to show a genuine dispute of material fact that Miron, Edringer, or DeLuca were deliberately indifferent to Hinneburg's serious medical need.

Because we affirm the grant of summary judgment on the merits, we need not address the issue of qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment as to defendants Miron, Edringer, and DeLuca.