RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

KIM HODGES, personal representative for the estate of
Michael Donte Molson,

        *Plaintiff-Appellee*,

    *v.*

JOSEPH ABRAM,

        *Defendant*,

STEPHEN DUMOND, Detective (24-1292); BRAXTON
CROWDER, Deputy, JASON KELLEY, Lieutenant,
WARREN HANSEN, ALEX FOX, and JASON MERVAU,
Detectives (24-1300),

        *Defendants-Appellants*.

Nos. 24-1292/1300

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00500—Jane M. Beckering, District Judge.

Argued: March 19, 2025

Decided and Filed: May 29, 2025

Before: CLAY, NALBANDIAN, and DAVIS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellant
Dumond. Neil E. Youngdahl, VARNUM LLP, Grand Rapids, Michigan, for Appellants
Crowder, Kelley, Hansen, Fox and Mervau. Christopher P. Desmond, VEN JOHNSON LAW,
PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Mary Massaron, PLUNKETT COONEY,
Bloomfield Hills, Michigan, for Appellant Dumond. Neil E. Youngdahl, Kyle P. Konwinski,
VARNUM LLP, Grand Rapids, Michigan, for Appellants Crowder, Kelley, Hansen, Fox and
Mervau. Christopher P. Desmond, VEN JOHNSON LAW, PLC, Detroit, Michigan, for
Appellee.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendant law enforcement officers of Kent County, Michigan, appeal the district court's denial of their motions for summary judgment in connection with this 42 U.S.C. § 1983 action for the alleged wrongful death of Michael Molson.   Plaintiff Kim Hodges, the administrator of Molson's estate, alleges that Defendants were deliberately indifferent to Molson's serious medical needs, resulting in his death.   For these public officials to be granted qualified immunity from liability, they must not have violated the decedent's clearly established constitutional rights.   Because this standard is satisfied, and for the reasons set forth below, we **REVERSE** the district court's denial of qualified immunity pursuant to Defendants' motions for summary judgment and **REMAND** for entry of judgment for Defendants.

## I.  BACKGROUND

### A.  Factual History

At approximately 5:00 p.m. on January 20, 2021, Defendant officers employed by Kent County, Michigan, drove to Michael Molson's residence in Grand Rapids, Michigan, "to execute a search warrant for crack cocaine."  Order, R. 140, Page ID #3647.  Outside Molson's house, Officer Dumond observed Molson sitting in the driver's seat of an SUV and attempting to drive away.  To prevent Molson from fleeing, the officers repositioned their vehicles to block the SUV. Officer Mervau drove to the driver's side of the SUV to help box it in, accompanied by Officer Kelley, who was a passenger in Mervau's patrol vehicle.  Kelley exited Mervau's car to approach Molson and noticed that "[Molson] placed something in his mouth."  Kelley Dep., R. 116-3, Page ID #745.  Although Kelley could not identify what the item was, he observed that Molson "appeared as if he was trying to swallow something" that was "too large" and "suspected it was narcotics."  *Id.* at 748.  Kelley promptly notified the other officers, who removed Molson from the SUV and commanded him to "spit it out" several times.  Deputy Crowder Body Cam., R. 116-13, at 17:17:13–24.

Molson refused to spit out the object, so the officers placed him "over the hood of a patrol vehicle and opened his mouth to stop him from swallowing drugs." Order, R. 140, Page ID #3649. Then, Officer Dumond "agitated Molson's Adam's Apple to initiate his gag reflex," which caused Molson to expel a plastic bag containing crack cocaine. *Id.* Officer Fox told Molson, "You're going to kill yourself eating that shit." Deputy Crowder Body Cam., R. 116-13, at 17:17:41–43. When the officers asked Molson if he had more drugs in his mouth, Molson did not respond. Molson was then handcuffed, searched, and escorted to the back of Officer Crowder's police cruiser.

During this time, the record shows that Molson did not exhibit any symptoms of drug use or intoxication, and none of the officers believed he had swallowed drugs. Officer Hansen said that Molson would have died if he had swallowed the bag of drugs but was under the impression that the officers had successfully gotten him to spit it out. Officer Crowder also did not think Molson had swallowed drugs. Similarly, Kelley and Mervau's observations of Molson did not yield any suspicion that he had swallowed drugs. Fox noted that there was a "general consensus" among the officers that Molson "could have killed himself" by swallowing the bag of drugs, but they were all "glad" he had not. Fox Dep., R. 116-7, Page ID #844. Several officers then proceeded to search Molson's residence.

At around 5:30 p.m., Dumond placed Molson in a different patrol vehicle, advised him of his rights, and interviewed him about his drug and criminal history. Dumond asked Molson if he swallowed any drugs, and Molson answered that he had not; but admitted that he had tried to swallow the bag of cocaine that officers retrieved from his mouth. Molson then proceeded to give "very specific" and "self-incriminating" statements about his involvement in the trade of narcotics. Dumond Dep., R. 116-10, Page ID #1006–07. Dumond asked Molson "multiple times" whether he swallowed any narcotics and even "relayed the dangerousness of the situation to him," but Molson repeatedly denied swallowing drugs. *Id.* at 1006, 1008. Based on this interview, which lasted thirty-two minutes, Dumond decided that Molson was being truthful about not swallowing drugs. He reasoned that since Molson shared information consistent with the amount and description of drugs found on the scene, and made several self-incriminating statements that would "help build a criminal case against him," he would have no reason to lie

about swallowing drugs, especially after being informed of the dangers in doing so.  *See id.* at 1006–07.  Throughout the interview, Dumond observed "no red flags" in Molson's behavior.  *Id.* at 1007.  He then led Molson back to Crowder's police cruiser and asked him if he had anything else on him.  Molson answered, "no."  Order, R. 140, Page ID #3653.  When Dumond asked him if he was "good," Molson said, "yes."  *Id.*

Shortly thereafter, Crowder transported Molson to the jail and walked him inside, where Molson filled out the intake form and answered "a series of standard pre-booking questions."  Order, R. 140, Page ID #3653.  "[Molson] answered no to everything," thus indicating that he had no medical or mental conditions.  Crowder Dep., R. 116-8, Page ID #898.  After taking inventory of Molson's possessions, Crowder escorted Molson to the check-in window, where intake personnel asked him "whether he had swallowed cocaine or any other drugs prior to arriving [at the jail]."  Order, R. 140, Page ID #3654.  Molson shook his head to indicate that he had not.  Crowder also "didn't think [Molson] had swallowed any drugs."  Crowder Dep., R. 116-8, Page ID #899.  At around 6:30 p.m., the jail finished processing Molson, and Crowder left the jail and did not return.

At approximately 7:16 p.m., Molson was examined by Registered Nurse Zachary O'Connor for "medical and mental health screenings."  O'Connor Decl., R. 116-21, Page ID #1103.  O'Connor determined that "Molson had a normal gait, normal breathing, normal skin appearance, and was not exhibiting signs of tremors, sweating, anxiety, lethargy, anger, aggressiveness, dilated pupils, confusion, or disorientation," and that his vital signs "were within normal ranges."  *Id.* at 1104.  During this evaluation, Molson "denied using illegal drugs" or other medications not prescribed to him.  *Id.*  He also denied being drunk or high, experiencing drug withdrawal concerns, or having suicidal thoughts.  *Id.*  "At no time did Mr. Molson verbally or non-verbally indicate that he had swallowed cocaine prior to arriving" at the jail.  *Id.*  When O'Connor asked Molson "if there was anything else [he] need[ed] to know about [Molson's] medical history," Molson said, "no."  *Id.* at 1103.

Shortly thereafter, Molson's mother contacted the jail to express her concern that Molson may have ingested drugs.  Specifically, she reported that "[Molson's] girlfriend called her and stated that he swallowed baggies of drugs."  *Id.* at 1114.  This phone call prompted Nurse

O'Connor to re-examine Molson at around 7:31 p.m.  O'Connor proceeded to question Molson, for the second time, about "whether he had swallowed any drugs," and Molson again confirmed that he had not.  *Id.* at 1104–05.  Rather, Molson explained that "he had tried to swallow drugs upon his arrest, but was unsuccessful," and that the officers "confiscated all of the drugs he had upon arrest."  *Id.* at 1105.  Molson also assured O'Connor that "he felt 'fine' and was 'ok,' and affirmed that he did not swallow any drugs."  *Id.*  Once again, O'Connor took Molson's vitals and found them to be "normal."  *Id.*  Jail staff also performed "a full-body X-ray of Molson, which showed no foreign objects."  Order, R. 140, Page ID #3654.  Finally, "[a]fter repeatedly denying having used or swallowed drugs and presenting normal vital signs," Molson was judged to be in decent health, and he "left the medical office to continue the intake and booking process at the jail."  *See* O'Connor Decl., R. 116-21, Page ID #1105.

The next day, January 21, 2021, Molson attended his virtual arraignment from 1:00 p.m. until about 1:10 p.m., and then returned to his jail cell.  At about 3:42 p.m., a deputy responded to an intercom call by Molson's cellmate and found Molson responsive, but incoherent.  Two staff members at the jail promptly called for help.  EMS then transferred Molson to the hospital, where he was pronounced dead at 6:37 p.m.  The autopsy revealed that Molson died of "[a]cute cocaine toxicity," with a "[f]oreign object (clear baggy with knot) found in [his] stomach." Autopsy Report, R. 117-2, Page ID #1332.  His postmortem blood test results showed 11,300 nanograms/milliliter of cocaine and 3,420 nanograms/milliliter of benzoylecgonine.  "In other words, Molson had successfully swallowed a bag of cocaine prior to the one forced from his throat by Defendant Dumond."  Order, R. 140, Page ID #3655.

### B.  Procedural History

On June 14, 2021, Kim Hodges, personal representative for Michael Molson's estate, commenced a 42 U.S.C. § 1983 and wrongful death action in the district court against Sergeant Joseph Abram, Kent County, and all "John Doe Deputies" who were either at the scene when Molson ingested the drugs, or "who knew that [he] was dying of a drug overdose and [] let him die."  Compl., R. 1, Page ID #3.  She later amended her complaint on November 18, 2021, naming Sergeant Joseph Abram, Deputy Braxton Crowder, Lieutenant Jason Kelley, Detective

Warren Hansen, Detective Alex Fox, Detective Stephen Dumond, Detective Denny Pittman,[1] and Detective Jason Mervau, as well as Kent County, as Defendants.

On September 1, 2023, Defendants filed two separate motions for summary judgment based on qualified immunity.  Defendants Abram, Crowder, Kelley, Hansen, Fox, Mervau, and Kent County filed a joint motion for summary judgment, while Defendant Dumond filed his motion for summary judgment separately.  Defendants argued that they were unaware of a risk to Molson's health, and that "[i]t was Molson's successful attempt at swallowing and hiding drugs from law enforcement that caused his death."  Defs.' Mot. for Summ. J., R. 116, Page ID #666. Plaintiff opposed both motions, arguing that "Defendant officers all knew that [Molson] had attempted to swallow dangerous narcotics then proceeded to just not care whether (or assume) he had not already swallowed another bag."  Pl.'s Resp. In Opp'n to Defs.' Mot. for Summ. J., R. 131, Page ID #2190.

On March 26, 2024, the district court granted summary judgment as to claims against Sergeant Abram and Kent County, and dismissed Plaintiff's wrongful death claims against all Defendants,[2] but otherwise denied Defendants' motions for summary judgment.  The district court reasoned that there was

> at least a genuine issue of material fact as to whether, after witnessing Molson in the act of swallowing drugs and extracting a lethal-sized bag of cocaine from his mouth, there was a risk of the harm of drug overdose so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Order, R. 140, Page ID #3664 (citing *Brawner v. Scott County*, 14 F.4th 585, 607 (6th Cir. 2021)).  The district court further concluded that there was a question of whether the officers behaved recklessly under the subjective component of *Brawner v. Scott County*'s deliberate indifference standard for pretrial detainees.  Finally, the district court found that Molson's need for medical attention was clearly established at the time of his arrest, thus precluding summary judgment for Defendants on qualified immunity grounds.

---

[1]On September 1, 2023, Defendant Pittman was dismissed from this action with prejudice.

[2]Plaintiff did not attempt to appeal the district court's grant of summary judgment for Sergeant Abram or Kent County, nor the dismissal of all wrongful death claims.

Officers Dumond, Crowder, Kelley, Hansen, Fox, and Mervau ("Defendants" or "the officers") pursued an interlocutory appeal and filed separate motions to stay the district court's proceedings. Plaintiff opposed the motions, and both were denied by the district court. Defendants then filed separate motions to stay the district court's proceedings under Federal Rule of Appellate Procedure 8(a)(2), which this Court granted on May 10, 2024.

## II.  DISCUSSION

### A.  Standard of Review

This Court reviews *de novo* the district court's denial of Defendants' motions for summary judgment. *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996); *see also Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir. 1991) ("Whether qualified immunity is applicable to an official's actions is a question of law."). Summary judgment is proper when the movant can show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In reviewing a motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party. *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

With respect to Defendants' motions for summary judgment on qualified immunity grounds, public officials performing discretionary functions are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### B.  Analysis

Plaintiff argues that Molson had an "obvious" medical need, and that Defendant officers were deliberately indifferent to it. *See* Appellee Br. No. 24-1300, ECF No. 32, 18. Specifically, she asserts that it is "obvious to any reasonable person that an individual who [h]as swallowed a bag of narcotics is in need of medical care." *Id.* at 17. She also argues that Molson's death in

custody from "acute cocaine toxicity," one day after the events in question, is sufficient to prove his objective medical need at the time of arrest. *See id.* at 16–17 (citing *Burwell v. City of Lansing*, 7 F.4th 456, 463 (6th Cir. 2021)). Additionally, because the officers saw Molson attempting to conceal evidence by swallowing a bag of drugs, Plaintiff alleges that they "knew" Molson was lying to them about not ingesting more drugs, and thus should have treated the situation as a medical emergency by taking him to the hospital. *See id.* at 18.

Defendants respond that Molson's need for medical care was far from obvious, given that he "had no symptoms and denied taking drugs," despite being asked about swallowing drugs several times. *See* Appellant Br. No. 24-1300, ECF No. 22, 42–43. In particular, they reference Molson's medical assessment at the jail and argue that if a registered nurse did not perceive a serious medical need, then certainly the officers could not have recognized it. To underscore this point, Defendants state that "no layperson recognized the necessity for a doctor's attention until Molson's cellmate called for help on January 21, 2024—about 22 hours after Deputy Crowder left the jail," at which point Molson had no further interactions with Defendants. *Id.* at 32. In light of these facts, we agree that Defendants did not act recklessly by taking Molson to the jail instead of the hospital and are entitled to qualified immunity.

Under the Fourteenth Amendment, pretrial detainees have an established right to medical care "that is analogous to the right of prisoners under the Eighth Amendment." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009) (quoting *Est. of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005)). An officer violates that right if they show "deliberate indifference to a pretrial detainee's serious medical needs." *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022) (cleaned up). Deliberate indifference consists of two prongs, one objective and the other subjective, and essentially requires that an officer "knew of and disregarded a substantial risk of serious harm to [the pretrial detainee's] health and safety." *Spears*, 589 F.3d at 254 (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)). For the objective prong, Plaintiff must show that Molson's medical need was "sufficiently serious." *Brawner*, 14 F.4th at 591 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the subjective prong, as modified by *Brawner*, Plaintiff must prove that Defendant officers acted with "more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* at 596 (quoting *Castro v.*

*County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)).  Because her claim fails to prove an objective medical need, we need not address the subjective prong.

Molson's medical need was not sufficiently serious within the meaning of the objective prong, where "obviousness" is a key factor.  *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 897–99 (6th Cir. 2004).  An injury or illness is "obvious" when "even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).  Some life-threatening conditions may speak for themselves, such as a gunshot wound or other serious injury.  *See Heeter v. Bowers*, 99 F.4th 900, 916 (6th Cir. 2024).  Additionally, "external signs of internal distress can indicate to a layperson that a detainee has a serious medical need," *Grote v. Kenton County*, 85 F.4th 397, 406 (6th Cir. 2023), such as "complain[ing] and vomiting," or "demonstrating the classic signs of an impending heart attack."  *Blackmore*, 390 F.3d at 900; *Est. of Carter*, 408 F.3d at 311.  We have also held "that drug or alcohol-related symptoms, like those associated with withdrawal or overdose, are sufficiently serious and obvious to laymen."  *Grote*, 85 F.4th at 406; *id.* at 408 (finding an obvious medical need when the detainee "was shaking and twitching," and "lacked basic motor control").  However, if a medical need is *non-obvious*, it must generally have been "diagnosed by a physician as mandating treatment," *see Blackmore*, 390 F.3d at 897 (quoting *Gaudreault*, 923 F.2d at 208), and proven by "verifying medical evidence."  *Id.* at 898 (citation omitted).

This Court has held that a medical need was not obvious, and hence not objectively serious, when it was not obvious to trained medical personnel.  *See Spears*, 589 F.3d at 255.  In *Spears*, a police officer received a dispatch that a man, Christopher McCargo, "was running up and down the street, hallucinating and otherwise behaving bizarrely."  *Id.* at 252.  When the officer arrived at the scene, McCargo admitted to "smoking crack cocaine."  *Id.*  He was then transported to the jail, where witnesses observed him "kick[ing] violently" and "rocking back and forth stating don't let the dogs get me."  *Id.*  McCargo received a medical examination prior to check-in, but "[b]oth the EMTs and jail officers concluded that [he] did not need to be transported to the hospital."  *Id.* at 252, 255.  Even so, McCargo "continued to hallucinate," was placed in a restraint chair "for his own safety," and eventually lost consciousness.  *Id.* at 252–53.

It was determined that the effects of cocaine toxicity caused McCargo's coma and eventual death. *See id.* at 253. Still, we held that the officer was entitled to qualified immunity because McCargo's condition was not obvious to trained medical personnel, and the officer "was less able than EMTs to determine McCargo's medical needs." *Id.* at 255.

Similarly, Molson's cocaine ingestion was not obvious to Defendant officers. When Molson put an object in his mouth, the officers immediately intervened and forced him to spit out a bag of cocaine. The officers did not observe Molson attempt to swallow anything else. When asked "two or three different times" if he swallowed drugs, Molson did not respond in the affirmative. *See* Kelley Dep., R. 116-3, Page ID #763. This led to a "general consensus" among the officers that Molson "could have killed himself" by swallowing the bag of drugs, but that he thankfully had not. Fox Dep., R. 116-7, Page ID #844. Officer Dumond then proceeded to interview Molson for thirty-two minutes. During this interview, Dumond again questioned him on whether he swallowed drugs, "multiple different ways[,] multiple different times," but Molson denied doing so each time. Dumond Dep., R. 116-10, Page ID # 1008–09. Dumond tended to believe Molson when he denied swallowing the drugs, given his truthful answers to other police questions and apparent willingness to "help build a criminal case against him[self]." *Id.* at 1007. Unlike the arrestee in *Spears*, who exhibited a variety of strange and concerning behaviors linked to drug use, Molson showed no symptoms whatsoever. *See* 589 F.3d at 252–53.

Molson continued to deny swallowing drugs at the jail. In the presence of Officer Crowder, Molson answered "no" to a series of pre-booking questions about his health, thus indicating "no issues." Crowder Dep., R. 116-8, Page ID #898. He also denied swallowing drugs to both intake and medical personnel. Approximately two hours after his arrest, Molson cleared his first medical exam. Nurse O'Connor determined that his vital signs were normal; his gait, breathing, and skin appeared normal; and he "was not exhibiting signs of tremors, sweating, anxiety, lethargy, anger, aggressiveness, dilated pupils, confusion, or disorientation." O'Connor Decl., R. 116-21, Page ID #1104. Molson then underwent a second medical evaluation, prompted by his mother's phone call communicating that he may have swallowed a bag of drugs, and was cleared once more. Despite his mother's concerns and O'Connor's efforts to assist him,

Molson continued to deny swallowing drugs, showed no symptoms of drug use, intoxication, overdose, or any other medical condition, and appeared to be in normal health.

It stands to reason that Molson's condition, which was not obvious to Nurse O'Connor after two medical evaluations, could not have been obvious to Defendant officers with minimal to no medical training. *See Spears*, 589 F.3d at 255 (rejecting the "obvious existence of a sufficiently serious medical need" when that need was not obvious to trained medical personnel). This is magnified by the factual details in the case, such as Molson's multiple assurances that he did not swallow drugs, and his persistent lack of symptoms that seemed to corroborate his lie. *See Grote*, 85 F.4th at 409–10 (recognizing that when a medical need is non-obvious and the arrestee denies ingesting drugs, "the defendants' knowledge of whether the person ingested drugs" may be "necessary to appreciate" that need). Unlike the inmate in *Grote v. Kenton County*, who denied ingesting drugs but displayed symptoms that supported at least a jury question of deliberate indifference, *see id.* at 409–11, Molson denied ingesting drugs *and* showed no symptoms at all. In sum, these facts demonstrate that Molson's medical need was even less obvious to a layperson than the one in *Spears*. 589 F.3d at 252–53.

Plaintiff suggests that because Molson tried to deceive law enforcement by swallowing and concealing drugs, the officers "knew" not to believe his lies related to drugs, and thus should have registered that he was suffering from "an objective medical emergency." Appellee Br. 24-1300, ECF No. 32, 18. This approach places an unreasonable burden on the officers, who were not required to second-guess Molson's many denials of drug-ingestion in the absence of any symptoms or behaviors that could have revealed his true condition to a layperson. In fact, it is unclear what more the officers could have done under the circumstances. Plaintiff's bare assertion that they "should have known" that Molson ingested drugs is not enough to "establish a claim of deliberate indifference." *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 837 (6th Cir. 2011). This is especially true since the officers "had no reason to doubt" that Molson would receive medical screening at the jail. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (recognizing no constitutional requirement to take a mentally unstable arrestee to the hospital instead of the jail). Indeed, Molson received not one but *two*

medical examinations at the jail, and the officers could not reasonably have perceived a health risk that evaded detection by a registered nurse. *See Spears*, 589 F.3d at 255.

Plaintiff also asserts that Molson's condition, caused by his ingestion of crack cocaine, was necessarily obvious because it led to his death. She submits that, under *Burwell v. City of Lansing*, "a condition resulting in death is 'sufficiently serious' to meet the objective component" of the deliberate indifference test. 7 F.4th at 463 (quoting *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018)). This proves too much. In overdose cases, *Burwell* notes that one consideration is whether laypersons "recognized the necessity for a doctor's attention." *Id.* at 464 (quoting *Hinneburg v. Miron*, 676 F. App'x 483, 486–87 (6th Cir. 2017)). Plaintiff cannot simply allege that a sufficiently serious medical need *technically existed* if it failed to manifest during the relevant period, and there was no objective reason for Defendants to know about it. *See Brady v. Powers*, No. 1:10-cv-45, 2011 WL 673949, at *3 (W.D. Mich. Feb. 17, 2011) (explaining that "[t]he mere presence of a serious medical condition is insufficient to establish the objective component").

Death alone does not suffice to prove the objective prong where the decedent, prior to their death, showed no symptoms of a serious medical need. *See Spears*, 589 F.3d at 253, 255. And Molson's death, one full day after his arrest, cannot establish "the obvious existence of a sufficiently serious medical need" under the circumstances, since Molson exhibited *no symptoms* for the entirety of January 20, 2021, and denied swallowing drugs at every possible opportunity. *See id.* at 255; *Grote*, 85 F.4th at 409–10. Because Plaintiff has not established that Molson's condition was objectively serious when the officers arrested and transported him to jail on January 20, 2021, and the officers had no later interactions with him, his death alone cannot serve as a sufficient basis for their liability.

Moreover, Plaintiff has not attempted to meet the objective prong under a non-obvious theory, and cannot do so, because she "has not provided the required verified medical evidence." Order, R. 140, Page ID #3662. To satisfy the objective prong under the non-obvious theory, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citations omitted). Before the district court, Plaintiff included a report by Dr. Werner U. Spitz,

claiming that "Molson would not have died" had he been taken to the hospital instead of jail. Spitz Report, R. 117-9, Page ID #1640.  But Spitz's report does not explain the effect of this delay, other than concluding that "the opportunity for treatment was delayed by a whole day." *Id.* at 1639.  Besides, Plaintiff did not respond to Defendants' objections to the admissibility of that report and has not otherwise attempted to show, through verifying medical evidence, that Molson's medical need was non-obvious.  *See Brady*, 2011 WL 673949, at *3; *Foreword Mag., Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (noting that such an objection shifts the burden to the proponent to show that the evidence is admissible).

Accordingly, Plaintiff has not established an objectively serious medical need.  This ends our inquiry on deliberate indifference, and we need not address the subjective prong.  *See Dodson v. Wilkinson*, 304 F. App'x 434, 439 (6th Cir. 2008) (noting that a deliberate indifference claim "requires proof of both the objective and subjective elements").  Because the officers committed no constitutional violation against Molson, they were not deliberately indifferent to his medical needs, and we need not address whether Molson had a clearly established right to medical care.  *Spears*, 589 F.3d at 256.  The officers are thus entitled to qualified immunity.

### III.  CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's denial of qualified immunity on Defendants' motions for summary judgment, and **REMAND** for entry of judgment for Defendants.